STATE OF NEW YORK
SUPREME COURT    COUNTY OF SUFFOLK
---------------------------------------------------------------------------
Oriska Corporation, individually and derivatively to
Carrier-Defendant Oriska Insurance Company,

               Plaintiff,                      AMENDED COMPLAINT
                                            Index No. EFCA 621892/2019

         v.                               Oneida Index EFCA2020-001276

NORTH SEA ASSOCIATES, LLC, - The Hamptons Center
               Employer-Defendant,

Bent Philipson, Benjamin Landa, Benjamin Fishoff
Ruth Hirsch, Pinchus Hoffman, Ronald Stern, Aaron Brecher
Alan Chopp, Eric Kalt, Jacob Pollack, Mayer Fiscl
Robert Kolman, Israel Pollack, Jeffrey Goldstein
Michael Pruzansky
               Owner-Defendant,

Oriska Insurance Company,
               Carrier-Defendant,

The Philipson Family Trust, The Schlesinger Family Trust, Berkshire
Group, Inc., Spencer Street Realty, Allstate ASO, Inc., Allstate
Administrators, Inc. Sam Schlesinger, Michael Camilleri, Pitterman
Family Trust, Wolf Eisenbach, National Financial Service, Israel
Zeigelman, Financial Service, Michael Schweimmer, Grandview
Brokerage, Inc. Isaac Muller. Broad Coverage Services, Inc.,
SentosaCare, LLC, Martin Schwartzman, Stella M. Vilardi, Raphael
A. Weitzner, Benjamin Landa, Ira Lipsius, Lipsius-Benhaim Law,
LLP, Whiteman Osterman & Hanna, LLP, Cullen and Dykman,
LLP, John Doe and other persons not yet identified,
               Prohibited Transaction Defendants,

Andrew Cuomo as the Governor of the State of New York, Linda A.
Lacewell as Superintendent of Insurance of the State of New York
Department of Financial Services, Martha Lees as General Counsel
of the Department of Financial Services, Roberta Reardon as the
Commissioner  of the State of New York Department of Labor,
Carolyn Robinson, Supervisor with the New York State Department
of Labor, Dr. Merryl H. Tisch, Chairman of the State University of
New York Board of Trustees, the State University of New York,
Scott Dietrich and Peter Fountas of the Research Foundation of the
State University of New York, Howard A. Zucker, M.D., as the
Commissioner of the State of New York Department of Health,
               State Officer Defendants,

Donna Hodge, Annette Hall, Karen Grant Williams Alexi Arias as
the Class Representatives of a Class of Employees of Employer

Defendants as the interests of the Class may appear,
                    Class Defendant,

Oriska Insurance Company as its interest may appear,
                    Carrier Defendant,

Rashbi Management, Inc., as its interest may appear,
                    Trust Defendant.
-----------------------------------------------------------------------------------

The Plaintiff, Oriska Corporation ("Plaintiff"), complaining of the Defendants alleges:

## NATURE OF THIS ACTION

1.      Illnesses, injuries and death of employees of the Employer Defendants (the "Class") in nursing home and healthcare facilities was preventable if the Employer Defendants had not denied the employee Class the benefits under their plan ("Plan") under a program (the "Program") approved for the Carrier Defendant Oriska Insurance Company as the Carrier's 1994 Program of 24 hour protection for employees established under 29 U.S.C. §1003 of the Employment Retirement Income Security Act ("ERISA") as an "employee benefit plan" sponsored by the Employer Defendants, a plan that includes training, apprenticeship and continuing education benefits, among other benefits, addressing infectious disease preparedness and response incorporated into a welfare plan. Instead, the funds accrued and reported by the Employer Defendants in Cost Reports to the New York Department of Health ("DOH") to cover employee benefits, were diverted, laundered and embezzled.

2.      The Employer Defendants' Plan is under a Program approved December 8, 1994 by the New York State Department of Insurance (now the DFS) of a November 15, 1994 File 93100407, and subsequent filings overing the Program. The Employer Defendants' failure to provide benefits is the direct and proximate cause of the tragedy that occurred in the Employer Defendants nursing home and healthcare facilities resulting from the failure of preparation in readiness to handle an enemy such as a pandemic, and is the direct proximate cause of the damage to the Class of employees, to patients in facilities, as well as exposing the general public; all

traceable to the foreseeable liability caused by the diversion, conversion and embezzlement of Plan assets.

3.      The tragedy at the Employer Defendants' nursing homes and healthcare facilities had its genesis in the year 2010 when the Employer Defendants, the Prohibited Transaction Defendants, and the Owner Operator Defendants, all in concert, organized and established their Plan under ERISA under the approved Program to provide health, disability, training, apprenticeship, continuing education, safety, loss control, risk-management and workers' compensation benefits by self-insurance or by the purchase of insurance, the 24-Hour protection. The Employer Defendants operated and administered their Program in various forms as their Plan to provide benefits to the employee Class Defendant for injuries and illnesses, skills and safety, continuing coverage to the present day, wherein and whereby various Employer Defendants entered and withdrew from the Plan and Program selecting parts of the Program as each Employer Defendant customized its Plan. The Employer Defendants selected from health, disability, training, apprenticeship, continuing education, safety, loss control, risk-management and workers' compensation benefit parts of the Program to fund benefits for their employees. The Employer Defendants were to contribute funds regularly to be held in trust with the Trust Defendant under their Plan to provide benefits by self-insurance or by purchase of insurance from the Carrier Defendant and others. Plan assets funded by the Employer Defendants were to be used only and exclusively for Program purposes and functions by due payment thereof to the proper insurance carrier or to the Trust Defendant to be held in trust for self-insured benefits.

4.      However, their Plan as organized by the Employer Defendants failed to provide any mechanisms for the Employer Defendants to manage the operation of their Plan under the Program. The Employer Defendants failed to monitor their Plan, failed to protect their Plan assets required for the Program and failed to supervise their Plan to make certain their Plan and Program functioned within the law as designed. Their Plan as organized failed to provide any mechanisms

to monitor, supervise and audit to ascertain that the funds were properly being administered from the time Employer Defendants paid funds to provide employee benefits until the funds were spent for Plan and Program purposes; the Employer Defendants were required to, but did not, establish, supervise and maintain the operation of their Plan and Program pursuant to authorization of ERISA and in accordance with the Program approved by the State.

5.     A Trust was established under NY Regulation 114, 11 NYCRR §126 ("114 Trust") to hold the monies paid by the Employer Defendants to secure and fund benefits to the Class; but the Employer Defendants permitted the Owner Operator Defendants and the parties in interest Prohibited Transaction Defendants to divert the funding of the Program, ignoring the security purpose of protecting Plan assets in the 114 Trust.

6.     The Program sponsoring Employer Defendants so negligently oversaw the operation of the Program by failing to maintain proper controls, policies and procedures regarding control of the Plan assets so as to carelessly and recklessly allow parties in interest Prohibited Transaction Defendants, Owner Operator Defendants, and the Employer Defendants themselves, to take, keep and divert tens of millions of dollars of the Plan assets intended for the Program, taken for illegal and unauthorized uses, the various Defendants utilizing these Plan assets for their own purposes, which were purposes not permitted or allowed by the Program because they are prohibited transactions under ERISA. Moreover, recovery is sought under 42 U.S.C. 1981 and 1985 for acts of the Employer Defendants, the Owner Operator Defendants and the Prohibited Transaction Defendants, in concert with New York State Officer Defendants under color of law in violation of 42 U.S.C. 1983. The 42 U.S.C. 1983 causes of action involve denial of equal protection and due process of law under the 1st, 5th and 14th Amendments to the United States Constitution for denial of equal protection and due process of laws, and for denial of right of assembly, as well as violation of 42 U.S.C. 2000e-2 for refusal of the Employer Defendants to adopt and implement the Program as an Alternative Employment Practice. The denial of the Alternative Employment

Practice is directed at disadvantaged persons based upon race and color as permitted proof on a 42 U.S.C. 2000e-2 action allowed by the US Supreme Court in Ricci v DeStefano 557 U.S. 557, a violation shown by statistics that the refusal to adopt the Alternative Employment Practice injured the Class as disadvantaged persons based on race and color, warranting the award of damages and injunctive relief as detailed herein.

7.     During the entire period of their Plan, these Employer Defendants, Owner Operator Defendants, party in interest Prohibited Transaction Defendants, in concert with State Officer Defendants, continued to wrongfully divert funds intended exclusively for their Plan to other purposes which had no relationship to the Program, although the diversions had personal significance to the Prohibited Transaction Defendants who were allowed by the Employer Defendants to divert the Plan assets.

8.     What happened is that the Employer Defendants, the Owner Operator Defendants, and Prohibited Transaction Defendants, in the course of the management of the Program deviated drastically from the purposes of the Program and ERISA by failing to put their Plan assets in trust, but instead took funds of their Plan to other personal purposes of wrongdoing Employer Defendants, Owner Operator Defendants and Prohibited Transaction Defendants, permitting these persons to utilize Plan assets for prohibited personal transactions, all of which had nothing to do with their Plan or Program. The Employer Defendants continued to misuse or allow others to misuse the Employer Defendants' fiduciary control over the Plan assets. This Amended Complaint describes a pattern of conduct of the Employer Defendants, Owner Operator Defendants, and Prohibited Transaction Defendants who were wrongfully aided and abetted by State Officer Defendants, which has caused their Plan to deny benefits to the employee Class.

9.     Exposed greed in the scheme of the Employer Defendants, Owner Operator Defendants, and Prohibited Transaction Defendants involved nursing home and healthcare facilities and businesses named herein, manipulating Medicaid and Medicare paid to nursing home

and healthcare facilities, a fixed payment per bed rate based on costs of operation. Under the scheme the Owner Operator Defendants gutted labor costs upon acquiring Employer Defendant facilities by hiring new employees with very limited skills and little or nonexistent experience. The Employer Defendants provided little, if any, training or continuing education to raise the level of competency of the workforce as well as provide other benefits under their Plan. Instead, the Employer Defendants, Owner Defendants and Prohibited Transaction Defendants hid, laundered and reaped the tens of millions of dollars in reported costs not spent on benefits for training, education, apprenticeship and employee benefits, getting away with these laundered funds embezzled to illicit prohibited transactions, the very funds intended to pay employee benefits.

10.     Lack of skills and know-how for sterilization, personal protective equipment, cleanliness, safety and emergency protocol and procedures for ventilator and other equipment operation, knowledge of Occupational Safety and Health Act ("OSHA") guidelines for handling bloodborne pathogens and Centers for Disease Control and Prevention ("CDC") Guidelines for disinfection and sterilization in healthcare facilities to address recognized health hazards likely to cause death or serious physical harm. Yet, these are basic reasonable and expectations from stewards of our loved ones.

11.     The scheme as set forth in the Lead Action in this case Index 09877/2019 ("Lead Action" or "Lead Complaint") identifies means and methods by which the Program was violated, involving misrepresentations, deceit, conversion, diverting, money laundering, theft and defalcations by the Lead Action Defendants Philipson, the Employer Defendants, and the owner operators, as well as involving Prohibited Transaction Defendants, all under color of law in complicity with the State Officer Defendants.

12.     Party in interest to the Plan, Attorney Ira Lipsius on behalf of the Employer Defendants sought to avoid paying premiums on policies obtained by their Plan for coverage of benefits, issued by Carrier Defendant Oriska Insurance Company ("Carrier Defendant" or "Oriska

Insurance Company"). Lipsius claimed that the policies were not "renewal" policies but rather "new" policies issued in violation of a February 1, 2013 Order ("1310 Order") prohibiting Oriska Insurance Company from issuing "new" policies due to a 2010 Report on Examination finding the Carrier impaired to the tune of over 8 million dollars. The 1310 Order provided that once the impairment was addressed and cured, the 1310 Order would be lifted. The impairment was addressed and cured on November 23, 2014 when the Carrier's parent company paid over 8 million dollars into the capital of the Carrier through a 114 Trust administered by Trust Defendant Rashbi Management, Inc. ("Trust Defendant" or "Rashbi").

13.    Even though the impairment was addressed and cured in 2014, Deputy General Counsel for the Department of Financial Services ("DFS") Martha Lees provided a letter dated February 7, 2019 to attorney Lipsius in support of the Employer Defendants' motion that they did not have to reimburse benefits paid or pay premiums because the policies of the Carrier Defendant were unenforceable pursuant to the 1310 Order still in effect, ignoring that the impairment was cured. Ms. Lees' letter recklessly disregarded the fact that the impairment was cured.  Ms. Lees consciously disregarded the fact that the impairment was addressed and she ignored the law of the case ratifying the prior accounting practice on these very same policies, when Ms. Lees stated in her letter of February 7, 2019 that the 1310 Order was still in in force. She thus allowed attorney Lipsius to argue the policies were unenforceable. Ms. Lees ignored Judge Julian's Order of 2007 specifically upholding the accounting principles and practices supporting the Program, a practice that provided for payment into a 114 Trust for collateral security for the self-insured high deductible loss sensitive Program. This is the same Program submitted by File 93100407 November 15, 1994, approved by the New York State Department of Insurance on December 8, 1994 and which remains today in full force and effect. This is the same Program governed by 29 U.S.C. § 1003 of ERISA as ratified by the DFS in a determination on October 5, 2015.

14.    Ms. Lees showed further contempt for the Carrier and complicity with Lipsius's goal of placing Carrier out of business in her affidavit of July 25, 2016 where she admitted that she rejected the Carrier's accounting practices and actuarial computations for the Employer Defendants' policies stating that the Carrier was financially impaired, even though Supreme Court Justice Robert Julian on the same issues held otherwise in Oneida County Supreme Court case CA2006-001542, where the 114 Trust was initially funded by the Employer Defendants.

15.    Ms. Lees' further complicity with the Employer Defendants and Lipsius and non-cooperation with the Carrier's counsel Daniel Hitzke as later herein set forth, further demonstrates a conspiracy to liquidate the Carrier, putting it out of business, and placing claim liability of the Employer Defendants into the Property and Liability Insurance Security Fund, Guaranty Fund under N.Y. Ins. Law §7603 (a)(1)(D), thereby relieving the Employer Defendants of their liabilities, The State would have one believe that the Employer Defendants would not be relieved of their liabilities, but that is not reality from past practice.

16.    Rights of subrogation of the Plaintiff Oriska Corporation arises out of common law rights of subrogation, exoneration and contribution, and Workers' Compensation Law §§§§26, 26-a, 50 and 52, requiring that the Plaintiffs/Employer Defendants by law disgorge and forfeit funds that have been diverted and wrongfully converted, including but not limited to the security fund identified in the Lead Complaint, diverted from the Program established and maintained by the Employer Defendants for the purpose of providing benefits for its participants and/or their beneficiaries, by self-insurance or through the purchase of insurance covering health, disability, including training, safety, loss control, risk-management and workers' compensation under the Program.

17.    The Plaintiff is subrogated derivatively to the Carrier Defendant under Business Corporation Law ("BCL") 626 to be reimbursed for benefits for medical care, lost wages and expense benefits provided to the Class, covering the liability of the Employer Defendants, a

statutory right of subrogation based on Workers' Compensation Law ("WCL") 29 and common law equitable rights of subrogation, indemnification and contribution for payments made and for future benefits due to the Class. The Employer Defendants have failed and refused to reimburse the benefits paid to the Class employees or to fund the 114 Trust for future benefits.

18.    Employer-Defendant North Sea Associates, LLC - The Hamptons Center ("Hamptons") is liable under Workers Compensation Law ("WCL") §10 as uninsured for Workers Compensation under WCL §50. The Employer-Defendant Hamptons disavowed and repudiated the Policy Workers Compensation and Employer Liability insurance provided by the Carrier-Defendant on September 19, 2019, leaving Employer-Defendant Hamptons uninsured as it relates to WCL §50, thus now empowering Class defendants with the option to elect commencement of plenary personal injury actions against Defendant-Employer Hamptons, or in the alternative to continue to accept workers' compensation benefits. If Class defendants elect workers' compensation benefits, then the Uninsured Employer Fund-Defendant ("UEF") is obligated to pay workers' compensation benefits to the Class defendants and reimburse Carrier-Defendant for benefits on grounds that the Carrier-Defendant was not the Workers' Compensation Carrier for Hamptons for purposes of WCL §50.

19.    Plaintiff brings this action derivative to Carrier-Defendant to subrogate to recover payments made by the Carrier-Defendant out of assets ultimately owned by the Plaintiff as set forth in this Complaint because after due demand pursuant to Business Corporation Law ("BCL") §626 the Carrier-Defendant has refused to abandon its defenses that the policies are legal and enforceable, in favor of terminating all benefit payments to injured Class defendants and turning the Class defendants' claims over to the UEF.

20.    The Plaintiff further brings this action derivative to Carrier-Defendant to subrogate to the rights and causes of action of the Class defendants herein against their uninsured Employer-Defendant Hamptons for negligence resulting in personal injury to injured Class defendants,

applying all the presumptions afforded an injured worker under WCL §11, subrogated for any benefits paid for medical care, lost wages and expenses of Class defendants of Hamptons paid by the Carrier-Defendant, a lien against any recovery of an Class defendant against Hamptons under Workers Compensation Law §29, and by subrogation as a direct action against the Employer Defendant if the Class defendant does not proceed against Hamptons within a time period set by the Court in this action.

21.    This derivative action by the Plaintiff on behalf of the Carrier-Defendant is on grounds that Workers Compensation & Employer Liability insurance provided by Carrier-Defendant to the Employer-Defendant is admitted as not enforceable, disavowed by Employer-Defendant as illegal Workers' Compensation Insurance, causing the Employer-Defendant Hamptons to be uninsured for purposes of WCL §50, being uninsured due to the direct acts of the Employer-Defendant and their agents and representatives; this action is against an admitted uninsured employer Hamptons and its Shareholder/Directors for personal liability for the medical care, compensation payments, penalties and possible criminal prosecution pursuant to WCL §26, all of whom indeed benefited.

PARTIES

22.    The Plaintiff, Oriska Corporation, as holder of 100% of the issued and outstanding common voting shares of Oriska Insurance Company at the time of the transactions complained of in this Complaint, brings the causes of action as alleged in this Complaint after having demanded that the Carrier-Defendant bring the causes of action asserted in this Complaint, because on October 25, 2019 the Carrier-Defendant after due consideration by the Board of Directors of the Carrier-Defendant and the Boards of Directors of Carrier-Defendant's parents, refused to abandon the Carrier-Defendant's defense that the policies are legal and enforceable, in favor of terminating all benefit payments to injured Class defendants and notify the UEF, such notification to advise the UEF that the Carrier-Defendant is not the Carrier on the claims of Class defendants set forth

in this Complaint, and undertake the rights and causes of action of the Carrier-Defendant against the Employer-Defendant, its Shareholder/Directors and also derivatively on behalf of each of the Class defendants named herein to recover benefits paid to such Class defendants by the Carrier-Defendant. Plaintiff has individual and derivative standing resulting from the demand and refusal to undertake the causes of action as set forth herein, pursuant to New York Business Corporation Law §626.

23.     The Class Representatives of the Defendant Class are Donna Hodge, Annette Hall, Karen Grant Williams, and Alexi Arias, a Class of employees of Employer Defendants, as the interests of the Class may here appear. The Class is a class of all employees of the Employer Defendants working for the Employer Defendants covered by the Program identified in this Amended Complaint.

24.     Upon information and belief, at all times mentioned in this complaint, Employer-Defendant North Sea Associates, LLC, - The Hamptons Center, was and still is a domestic corporation incorporated under the laws of the State of New York, 3015 West 29th Street, Brooklyn, NY 11224.

25.     Bent Philipson, Owner-Defendant is a Shareholder/Director of the Employer-Defendant, Hamptons Center , who upon information and belief as a Shareholder/Director of the Employer-Defendant are the WCL §§26(a) and 52 equivalent of the president, secretary or treasurer of the Employer-Defendant and are jointly and severally liable with the Employer-Defendant.

26.     Benjamin Landa, Owner-Defendant is a Shareholder/Director of the Employer-Defendant, Hamptons Center  who upon information and belief as a Shareholder/Director of the Employer-Defendant are the WCL §§26(a) and 52 equivalent of the president, secretary or treasurer of the Employer-Defendant and are jointly and severally liable with the Employer-Defendant.

27.    Benjamin Fishoff, Owner-Defendant is a Shareholder/Director of the Employer-Defendant, Hamptons Center  who upon information and belief as a Shareholder/Director of the Employer-Defendant are the WCL §§26(a) and 52 equivalent of the president, secretary or treasurer of the Employer-Defendant and are jointly and severally liable with the Employer-Defendant.

28.    Ruth Hirsch, Owner-Defendant is a Shareholder/Director of the Employer-Defendant, Hamptons Center who upon information and belief as a Shareholder/Director of the Employer-Defendant are the WCL §§26(a) and 52 equivalent of the president, secretary or treasurer of the Employer-Defendant and are jointly and severally liable with the Employer-Defendant.

29.    Pinchus Hoffman, Owner-Defendant is a Shareholder/Director of the Employer-Defendant, Hamptons Center and upon information and belief is a Shareholder/Director of the Employer-Defendant are the WCL §§26(a) and 52 equivalent of the president, secretary or treasurer of the Employer-Defendant and are jointly and severally liable with the Employer-Defendant.

30.    Ronald Stern Owner-Defendant is a Shareholder/Director of the Employer-Defendant, Hamptons Center who upon information and belief as a Shareholder/Director of the Employer-Defendant are the WCL §§26(a) and 52 equivalent of the president, secretary or treasurer of the Employer-Defendant and are jointly and severally liable with the Employer-Defendant.

31.    Aaron Brecher Owner-Defendant is a Shareholder/Director of the Employer-Defendant, Hamptons Center  who upon information and belief as a Shareholder/Director of the Employer-Defendant are the WCL §§26(a) and 52 equivalent of the president, secretary or treasurer of the Employer-Defendant and are jointly and severally liable with the Employer-Defendant.

32.    Alan Chopp Owner-Defendant is a Shareholder/Director of the Employer-Defendant, Hamptons Center who upon information and belief as a Shareholder/Director of the Employer-Defendant are the WCL §§26(a) and 52 equivalent of the president, secretary or treasurer of the Employer-Defendant and are jointly and severally liable with the Employer-Defendant.

33.    Eric Kalt Owner-Defendant is a Shareholder/Director of the Employer-Defendant, Hamptons Center who upon information and belief as a Shareholder/Director of the Employer-Defendant are the WCL §§26(a) and 52 equivalent of the president, secretary or treasurer of the Employer-Defendant and are jointly and severally liable with the Employer-Defendant.

34.    Jacob Pollack Owner-Defendant is a Shareholder/Director of the Employer-Defendant, Hamptons Center  who upon information and belief as a Shareholder/Director of the Employer-Defendant are the WCL §§26(a) and 52 equivalent of the president, secretary or treasurer of the Employer-Defendant and are jointly and severally liable with the Employer-Defendant.

35.    Mayer Fiscl Owner-Defendant is a Shareholder/Director of the Employer-Defendant, Hamptons Center who upon information and belief as a Shareholder/Director of the Employer-Defendant are the WCL §§26(a) and 52 equivalent of the president, secretary or treasurer of the Employer-Defendant and are jointly and severally liable with the Employer-Defendant.

36.    Robert Kolman Owner-Defendant is a Shareholder/Director of the Employer-Defendant, Hamptons Center who upon information and belief as a Shareholder/Director of the Employer-Defendant are the WCL §§26(a) and 52 equivalent of the president, secretary or treasurer of the Employer-Defendant and are jointly and severally liable with the Employer-Defendant.

37.    Israel Pollack Owner-Defendant is a Shareholder/Director of the Employer-

Defendant, Hamptons Center who upon information and belief as a Shareholder/Director of the Employer-Defendant are the WCL §§26(a) and 52 equivalent of the president, secretary or treasurer of the Employer-Defendant and are jointly and severally liable with the Employer-Defendant.

38.     Jeffrey Goldstein Owner-Defendant is a Shareholder/Director of the Employer-Defendant, Hamptons Center who upon information and belief as a Shareholder/Director of the Employer-Defendant are the WCL §§26(a) and 52 equivalent of the president, secretary or treasurer of the Employer-Defendant and are jointly and severally liable with the Employer-Defendant.

39.     Michael Pruzansky Owner-Defendant is a Shareholder/Director of the Employer-Defendant, Hamptons Center who upon information and belief as a Shareholder/Director of the Employer-Defendant are the WCL §§26(a) and 52 equivalent of the president, secretary or treasurer of the Employer-Defendant and are jointly and severally liable with the Employer-Defendant.

40.     At all times mentioned in this complaint, Class defendants, more specifically described in the Factual Allegations below, work in Suffolk County and were employees of and are named as nominal defendants by reason of the fact that they are now empowered with an option to elect to continue to take workers' compensation benefits or to bring a negligence action for the negligence and injuries as hereinafter set forth to which the Carrier-Defendant is subrogated by virtue of the payments that it has made to the Class defendants, the Carrier-Defendant failing to undertake an action for subrogation after due demand by the Plaintiff, the Plaintiff now brings this derivative action on behalf of the Carrier-Defendant.

41.     The Carrier-Defendant is a duly organized and existing domestic insurance company chartered and organized under and existing by virtue of the laws of the State of New York with its principal office and place of business in Oriskany, Oneida County, New York, where

it is engaged in providing various types of insurance coverage in the State of New York including among others workers compensation and employer liability insurance.

## Facts Common to All Causes of Action

42.    The Employer Defendants, as Plan Sponsors, sponsored a benefit plan (the "Plan" or "Program") for health, disability, apprenticeship and safety training, loss control, risk management and workers' compensation benefits which are the obligations of their Plan.

43.    The Class are participants in the Program sponsored by the Employer Defendants, with their Plan providing benefits to Class members.

44.    In June 2012, the Employer Defendants and each of them contracted with a Policy Manager Allstate ASO, Inc./Allstate Administrators, Inc. to obtain coverage for health, disability, safety training, loss control and workers' compensation benefits coverage as set forth in certain administrative agreements, calling for the Manager to negotiate coverages and policies of insurance to provide benefits under the Program, with ultimate control of all aspects of their Plan and Program retained by the Employer Defendants. The Employer Defendants at all times retained authority over the Plan assets. The Manager paid the carriers on behalf of the Employer Defendants. Their Plan provided that the Manager will review all invoices and audit payments from Plan assets of funds tendered by the Employer Defendants to their Plan, both payments to carriers where coverage was placed, and of all self-insured retention and deductible obligations. The Employer Defendants indemnified the actions of the Manager and retained authority over their Plan with the right to terminate the Manager at the Employer Defendants' option. The Manager was to provide "Administrative Oversight of a facilities Workers' Compensation, Health and Disability Program", but control over the Fund Assets was not delegated to Manager, but rather was retained by the Employer Defendants.

45.     The Employer Defendants funding of the Program was pooled as Plan assets to be held in trust for the Class of employees under the fiduciary responsibility of the Employer Defendants.

46.     The Program remains in full force and effect until all obligations of the Employer Defendants are fully satisfied.

47.     Employee benefits under the Program were provided in the following categories:

    a.  Health
    b.  Disability
    c.  Worker' Compensation
    d.  Risk Management
    e.  Safety training, apprenticeship, continuing education in safety and skills

48.     Health benefits were self-insured under the Program and administered by the American Plan Administrators.

49.     Disability benefits were provided under the Program by purchasing insurance policies from the following insurance carriers:

United Health Administrators Inc
Standard Security Life Insurance Company
First Insurance Funding Corp
HCC Life Insurance Company
First Rehabilitation Life
The United States Life Insurance Company
Oxford Health Plans
Zurich American Insurance Company
Arch Insurance Group
National Continental Ins. Company
New York Life Insurance Company
Progressive Casualty Insurance
The Hartford
Patriot Underwriters Inc.
United Financial Casualty Company
Dongbu Insurance

50.     Health, risk management, safety training, apprenticeship, and continuing education in safety and skills were self-insured under the Program. Workers' compensation benefits were provided under the Program by a self-funded large deductible of the Program under the coverage provided by Carrier Defendant Oriska Insurance Company.

51.     Bank accounts of Employer Defendants have been forensically analyzed and are the subject of this Amended Complaint. Funding for their Plan was made into the following pooled bank accounts:

Account Number          Bank Name
483002632983 BANK OF AMERICA, N.A.
483002632996 BANK OF AMERICA, N.A.
483002634444 BANK OF AMERICA, N.A.
483031636604 BANK OF AMERICA, N.A.
483031636617 BANK OF AMERICA, N.A.

52.     Funding from Employer Defendant into their Plan to the four pooled Plan bank accounts holding the Plan assets from June 11, 2010 to May 1, 2018, from the remitter Bank accounts for the Employer Defendant is tabulated as set forth below:

Employer Defendant          Total Remitted
Hamptons          $6,630,294.49

53.     The Plan assets were to be held in trust under NY Regulation 114 (11 NYCRR §126) to pay or provide benefits by self-insuring or purchasing insurance to pay ongoing present and actuarially determined future obligations of the Program ("Obligations").

54.     The Manager was also required to provide an updated actuarial analysis of the Obligations of the Program. Upon information and belief, neither the Employer Defendants nor their Managers provided the actuarial analysis.

55.     The Program provides that the Employer Defendants are jointly and severally liable under the Program including, but not limited to, the obligations to pay premiums, fund and maintain all required balances in the Loss Fund, and provide collateral to pay all obligations

incurred under the Program. Any default by the Employer Defendants either jointly or individually in meeting financial obligations under the Program may be satisfied from any Loss Fund balances or collateral provided under the Program.

56.    Specific identified disbursements relating to benefits paid by the Employer Defendants are as follows:

$38,149,012 was paid to American Plan Administrators for health claims, the period covering June 11, 2010 through May 1, 2018;

$1,870,900 was paid to disability carriers on behalf of the Employers, the period covering June 10, June 11,2010 through May 1, 2018;

$42,489,563 was paid for workers' compensation coverage, the period covering June 10, June 11,2010 through May 1, 2018;

57.    It was part of said scheme that from 2002 until June 2018, the Defendants would and did submit false and fraudulent annual Cost Reports to the DOH, via interstate wire (electronic filing), for employee benefit costs and other employment-related expenses associated with the Class of employees of the Employer Defendants.

58.    It was a part of the scheme that the Cost Reports included the costs for "Workmen's Compensation Insurance"[1] as direct costs in relation to wages of employees of Employers, when in fact, as Defendants well knew and believed, as set forth previously herein, the funds were diverted from payment to the authorized insurance carrier.

59.    It was a part of the scheme that such services were not lawfully represented in the billing by Defendants for workers' compensation insurance expense. In fact, the funds were received by the Defendants and then diverted for purposes other than represented to the DOH.

**The Trust Fund Scheme**

---

[1] term used in the Cost Report DOH form

60.     It was part of the scheme that from 2002 to 2018 the Defendants were not fully funding and were in fact diverting assets from the Program.

61.     Oriska Insurance entered into various 114 Trusts under NY Regulation 114, 11 NYCRR §126 ("114 Trust") to receive collateral for workers' compensation coverage by the Employer Defendants to be held to secure payment of workers' compensation benefits. Rashbi became the Administrator of the Employer Defendants loss sensitive program and set up a fiduciary New York Regulation 114 Trust.

62.     In 2007, the Defendants entered into a trust agreement with the Defendants at HSBC Bank as part of the settlement of a federal lawsuit (03-CV-01481, NDNY) and to address the receivership issue brought by the DFS.

63.     A trust was established at TD Bank in 2011 for the loss sensitive program established in 2010 after Oriska Insurance was released from receivership and Employer Defendants came back to Oriska Insurance to resume writing loss sensitive coverage.

64.     A trust was established at IBD Bank of New York in 2014 as part of the settlement of Oneida County Supreme Court lawsuits brought in 2012.

65.     Oriska Insurance and Employer Defendants set up the most recent 114 Trust with IDB Bank of New York Trust as Trustee, which Trust is the successor to a TD Bank Trust Agreement dated February 24, 2011 and amended May 15, 2012, and March 19, 2013 (" TD Bank Trust"), which was the successor to a certain HSBC Bank Trust Agreement dated November 28, 2006 ("Rashbi Trust"), collectively referred to as "114 Trusts."

66.     It was the purpose of the 114 Trusts to receive loss fund payments from Employer Defendants and others into trust for reimbursement to Plaintiff for benefits paid on behalf of Employer Defendants, to hold funds as collateral paid in Trust on behalf of employees of Employer Defendants, jointly and severally pooling such funds to cover claims of employees of Employer Defendants.

67.     The trust agreements were first submitted to the DFS in 2006 in order to obtain approval for the disposition of NDNY Federal Case No. 03-cv-01481 (NDNY), and to resolve the receivership brought against plaintiff in State Supreme Court on grounds that US Management and its clients including the Employer Defendants had not provided collateral in a form acceptable to secure reimbursement of workers' compensation benefits. As the matters in litigation proceeded toward trial, the form of trust was resubmitted for approval by the DFS in 2007, using the form of agreement in accordance with New York regulation 114 (11 NYCRR §126). The form of trust was submitted relative to the deductible loss sensitive filing documents submitted and approved by the DFS on December 6, 2007. A subsequent trust with TD Bank was submitted to the DFS on December 1, 2014, for ratification for use with the loss sensitive deductible program agreed to in the settlement of litigation with the Employer Defendants and others on September 24, 2013.

68.     It was a part of the scheme that in September 2013, as part of a settlement of lawsuits brought by Oriska Insurance in State Supreme Court in summer of 2012, the Defendants agreed to fund a loss settlement trust (New York Regulation "114 Trust" under NY Regulation 114, 11 NYCRR §126). The purpose of the 114 Trust was to hold the Plan assets of the Program, to be paid to a Loss Fund when benefits were due, all under fiduciary control in the 114 Trust for reimbursement of claims for benefits. The first 114 Trust established for this purpose under the Program was in November 2006 with HSBC Bank.

69.     Trust agreements were first submitted to the DFS in 2006 in order to obtain approval for the disposition of NDNY Federal Case No. 03-cv-01481 (NDNY), and to resolve the receivership action brought against Oriska Insurance Company in State Supreme Court. As the matters in litigation proceeded toward trial, the form of trust was submitted for approval by the DFS in 2007, using the form of agreement in accordance with New York regulation 114 (11 NYCRR §126).

70.    In 2007, the Employer Defendants or by their agents, owners and operators entered into a trust agreement at HSBC Bank as part of the settlement of a federal lawsuit (03-CV-01481, NDNY) with Rashbi as the Administrator, to address a receivership issue brought by the New York State Department of Insurance, now the DFS.

71.    A trust was established at TD Bank in 2011 with BCS as the Settlor of the trust.

72.    114 Trusts under NY Regulation 114 (11 NYCRR §126) were established to receive Program funds as collateral for benefit liability of the Employer Defendants.

73.    It was part of the scheme that the Defendant Isaac Muller/BCS intentionally failed to fund the 114 Trust from 2012 until May 2013.

74.    Then, in March 2013,  Rashbi as the settlor, became the Administrator of a 114 Trust at IDB Bank of New York after Defendant BCS was removed from the TD Bank 114 Trust.

## What Happened to Cost Report Accruals to Fund the Program

75.    It was a part of the scheme for the Employer Defendants to receive funds from Medicaid, Medicare, private pay, and insurance.

76.    It was a part of the scheme that Employer Defendants electronically filed annual Cost Reports (Form RHCF-4) with the DOH for the years 2002 through 2017, when in fact, the premiums were diverted for personal purposes instead of held to pay benefits under the Program.

77.    It was a part of the scheme that such funds received by the Defendants were diverted from and not used to fund the 114 Trust or otherwise used by the Employer Defendants to pay or reimburse the payment of benefits paid to the Class on behalf of the Employer Defendants.

78.    It was part of the scheme that from at least 2002 to at least December 2017, the Defendants would and did submit false and fraudulent annual Cost Reports to the DOH via interstate wire (electronic filing), to report "Workmen's Compensation Insurance" expenses by the Employer Defendants.

79.    It was a part of the scheme that the Cost Reports accrued "Workmen's Compensation Insurance", but these expenses were not paid by the Employer Defendants to Oriska Insurance.

80.    It was a part of the scheme that the Cost Reports included the costs for workers' compensation insurance coverage at Part IV, as certified in the Employer Defendants' Cost Reports (Form RHCF-4), when in fact, as Defendants well knew and believed, as set forth previously herein, that the funds were diverted away from payment of benefits.

81.    It was a part of the scheme that from 2002 up to December 2017, each of the Employer Defendants submitted approximately sixteen (16) false and fraudulent certified annual Cost Reports (Forms RHCF-4) via interstate wires (electronic filing), in which each form falsely stated in Part IV, Schedule 6 (Employee Benefits), for example stating that the Employer Defendants had incurred and paid "Workmen's Compensation Insurance" expenses in the amounts set forth in the Reports.

82.    It was a part of the scheme that the payments were diverted to pay other personal and other business obligations of the Employer Defendants.

83.    It was a part of the scheme that the Employer Defendants defrauded their Plan and the Program out of substantial sums as a result of the diversions.

84.    It was part of the scheme to use the superior knowledge, access and experience of Bent Philipson, including, but not limited to, Philipson's role personally or through agents, to make purchases of insurance coverages or making recommendations with respect thereto, facilitating the placement of health, disability and workers' compensation coverage.

85.    It was part of the scheme, as a result of the relationship between Employer Defendants and Philipson, including, but not limited to, their role and superior knowledge and information regarding the occupational and non-occupational benefit plans for Employer Defendants' employees, along with ownership in the Employer Defendants in common makes the

Employer Defendants, and Owner/Operator Defendants, knowledgeable of the deceptive Cost Reports represented and submitted to the DOH.

86.     Employer Defendants made false statements in Cost Reports to the DOH regarding expenses for employee benefits which included statements that insurance coverage was being provided by Allstate as represented by its billing to the Employer Defendants.

87.     Employer Defendants' fraudulent scheme is premised on their unlawfully siphoning the Employer Defendants' Medicaid, private pay, Medicare and insurance funds reported as intended for employee benefits. By virtue of the acts described above, the Defendant knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay money to the Government, and/or knowingly concealed or knowingly and improperly received funds which were not used for their intended and represented purpose.

88.     Employer Defendants or their appointed designees did not pay or otherwise fund the Program.

89.     Through the above-described conduct, Employer Defendants knowingly presented or caused to be presented false or fraudulent reports for payment or approval; and/or made, used, or caused to be made or used, a false record or statement to get false or fraudulent claims paid or approved; and/or made, used, or caused to be made or used, false records or statements to conceal that Employer Defendants were diverting funds.

90.     Specifically, Employer Defendants filed annual Cost Reports with the New York DOH, which among other things, falsely and impliedly certified that Employer Defendants were in compliance with all applicable laws and regulations.

91.     It was part of the scheme to provide false certification where the act of submitting false reports themselves implies compliance with governing rules that are a precondition to payment.

92.    It was part of the scheme for Employers to submit claims falsely representing and certifying compliance with a statute, regulation, or contractual provision, compliance being a precondition to government payment of the claim.

93.    It was part of the scheme for the Employer Defendants to fail to disclose noncompliance with material statutory, regulatory, or contractual requirements.

94.    Employer Defendants well knew that Program services were not lawfully represented in the billing by Allstate, yet the Employer Defendants engaged in a continuous and pervasive pattern of deceiving the DOH by Defendants' filing false Cost Reports when in fact the pattern and practice was to receive the monies and then divert the reimbursement for purposes other than as represented to the DOH.

**The 2013 and Prior Theft of Plan Assets**

95.    Beginning in February 2012 the Employer Defendants stopped funding the loss sensitive program, causing the Carrier Defendant to cancel coverage on May 22, 2012. The Employer Defendants obtained a restraining order from Supreme Court Kings County, Index Number 10608/12 stopping the cancellation of coverage.

96.    It was a part of the scheme that Defendants failed to fully fund the 114 Trust, including substantial unreimbursed claims from the 2002-2008 period, and continued the same failure to fund from February 2012 through May 1, 2013, and then only partially funded, intermittently and anemically resulting in the shortfall in funding of their Plan and Program as set forth in this Amended Complaint.

**The Diversion of Program Funding of Accrued Cost Report Expenses to Capitalize S&P is an Example of Many Defalcations**

97.    In 2017 and 2018, Oriska Insurance continued its investigation into the default by the Employer Defendants regarding the $3,207,065.92 unpaid premiums and found that the default

was part of a larger defalcation involving the Employer Defendants that had been perpetrated by various individuals and by various means spanning many years.

98.    It was a part of the scheme that on June 11, 2017, a meeting was held with Defendant Philipson on behalf of the Employers, attending with his attorney, Ira Lipsius, Philipson and Sam Schlesinger in attendance. The meeting was held at a restaurant in Teaneck, New Jersey to discuss payment owed by Employer Defendants to their Plan trust.

99.    At the meeting, it was confirmed by Philipson that the Employers had not paid $3,207,065.92 due from January to May 2017 for workers' compensation coverage which Plaintiff had renewed for the Employers on January 1, 2017. At the meeting, Defendant Philipson falsely stated: "I'm current", all the while Philipson well knew that the payments were not made to the trust, but instead were diverted to prohibited transactions.

100.    It was a part of the scheme, that Philipson falsely represented on June 11, 2017 that the Employer Defendants would make future payments by the 15th of each month beginning July 2017, while in the interim Philipson would investigate what happened with the $3,207,065.92.

101.    It was a part of the scheme that $3,207,065.92 was not paid and no explanation was received from Employer Defendants. As a result, on June 16, 2017, the Carrier Oriska Insurance canceled the workers' compensation coverage due to nonpayment of funding for workers' compensation coverage from January 1, 2017 to June 1, 2017.

102.    It was a part of the scheme that on or about June 22, 2017, Ben Landa called Oriska Insurance, with his attorney Lipsius on the telephone line, and spoke with Sarah Oddi, the President of Oriska Insurance, requesting that Oriska Insurance reinstate the workers' compensation coverage for the Employers, while falsely agreeing to pay the $3,207,065.92.

103.    It was a part of the scheme that on June 27, 2018 at Philipson's office in Woodmere, New York, Defendant Philipson falsely stated that Defendants would pay the installment payments

due from June 1 going forward by the 15th of the month and would investigate the unpaid amount of $3,207,065.92 due for January 1, 2017 through May 31, 2017.

104.    It was a part of the scheme that, Philipson requested that Oriska Insurance reinstate insurance coverage. Relying on the false statements of the Defendants including Philipson's false and misleading representations, on the afternoon of June 27, 2017, Oriska Insurance reinstated the insurance coverage.

105.    It was a part of the scheme that the Defendants employed these tactics to lull the Defendant Oriska Insurance into a false sense of security and to hide the fact that the Employer Defendants were plotting to obtain coverage from their newly capitalized insurance carrier S & P. It was a part of the scheme that the Employer Defendants notified Oriska Insurance in early May 2018 that they intended to cancel the insurance coverage.

106.    It was a part of the scheme that the Employers failed to pay the $3,207,065.92 in insurance premiums.

107.    It was a part of the scheme that installment payments were made directly to Oriska Insurance beginning on July 25, 2017, from the Employer Defendants to Oriska Insurance. However, these payments became later and later each month, falling a full month late by December 2017.

## The 2017-2018 Theft of Plan Assets to Partially Capitalize S&P

108.    It was part of the scheme that the enterprise failed and refused to pay premiums from January to June 2017 in the amount of $3,207,065.92.

109.    It was a part of the scheme that the $3,207,065.92 in insurance benefits owed to Oriska Insurance for benefits paid to the Class of employees of the Employer Defendants, was never paid.

110.    It was a part of the scheme, that Standard and Preferred Insurance Holdings, Inc., wholly owned by the Defendants' Philipson/Schlesinger Family Partnerships, contributed

$1,500,000 paid in capital and $8,510,042 of paid in surplus to S&P, showing cash as the basis of capitalization, while at the same time failing to pay and fund the Plan trust for the first 6 months of 2017 and not maintaining the funds in trust with an independent fiduciary as required by law.

111.    It was a part of the scheme that on May 27, 2017, Defendant Philipson in response to a financial examination by the New York State Department of Financial Services, sought to license Standard and Preferred Insurance Company ("S & P") to become licensed as a New York domestic property and casualty insurance Company using Plan assets or diverting earmarked and accrued Cost Report employee benefit expense Plan funding for non-Program prohibited transactions.

112.    It was a part of the scheme, that in a series of e–mails sent via the internet between March 1 and March 29, 2018, and in response to demands by Oriska Insurance as to when payment would be made, the Defendant Philipson falsely stated, inter alia, that he: "Will check".

113.    It was a part of the scheme that Defendant Philipson, via internet email on March 29, 2018, demanded copies of the insurance policies (which he already had) as a condition of payment.

114.    It was a part of the scheme that Employer Defendants replaced the Oriska Insurance coverage with S&P as their carrier sometime in 2018.

115.    It was a part of the scheme that on November 30, 2017, Defendants Philipson/ Schlesinger completed the process of licensing S&P.

## 9/24/2013 Settlement with the Employer Defendants

116.    A part of the scheme arose out of a settlement in September 2013, of lawsuits brought by Oriska Insurance in State Supreme Court in summer of 2012 involving the Program, which is the basis of their Plan, the Employer Defendants agreed to fund a loss settlement trust (the New York Regulation "114 Trust").

117.    Then a trust was established at IBD Bank of New York in 2014 with Rashbi as the Administrator as part of the settlement of Oneida County Supreme Court lawsuits brought in 2012.

118.    It was the purpose of the 114 Trusts to receive loss fund payments from Employer Defendants and others into trust for benefits paid on behalf of Employer Defendants, to hold funds as collateral paid in trust to cover the liability of the Employer Defendants, jointly and severally pooling such funds to cover employee benefits.

119.    The Employer Defendants conspired as part of the scheme with party in interest Defendant Muller, causing Muller to intentionally fail to fund the 114 Trust from January 2012 until May 2013, at the same time that the Employer Defendants' Plan assets were being used to capitalize S & P Insurance.

## Parties in Interest

120.    Parties in Interest identified as receiving and converting Plan Assets and or aiding and abetting conversion of Plan Assets, including but not limited to are: the Philipson Family Trust, the Schlesinger Family Trust, Gary Baker, Jon Halpern, Israel Ziegelman, Ben Landa, Ira Lipsius, Michael Schweimmer, Michael Camilleri, Stella M. Vilardi, Martin Schwartzman, The Berkshire Group, Spencer Street Realty, Pitterman Trust, Wolf Eisenbach, Raphael A. Weitzner, Chaim Hirsch, Israel Weber, Joseph Stern, Yeshiva Tiferes Boruch, M K Realty, Joseph Deutsch, Golden Hill Health Care Center, Hershkowitz And SH, Hamburg Staff Training LLC, Bsimcha Family Trust, Broadway Premium Funding, Law Offices of Rosemary, Mayer Fishchl, Atlas Title of S.W.FL, The Law Office of David, Morris E. Barebaum Esq, Hallets Holding LLC., Eva Gruenberger, Moses Grunfeld, Bank Correction, Executive Staff Training, Grand Strategy, M Elsenbach, Venture Captive Management, Citi Cards, Financial Services, Stein Farkas and Schwartz, Abraham Berko, Benzion Frankel P.C., Gold Management, Heller Horowitz, 5506 15 Ave, Realty LLL, Goflow Commerce, Khal Torath Chaim, Guarantee Insurance Company, Crosstown Management, Raphael A Weitzner Esq, Secured Lending Services, Excellent Realty,

ABW Holding LLC, Yides Madlowits, Klein Zeiman Rothermel LLP, Tom Norsworthy, Abrams Fensterman, Michele L Loesch, EWS Consulting Group, Ptex Group, N. Blumefrucht CPA PC, United States Treasury, Superfine Printing, HMH Iron Design, Weiss Stationary Inc, Fred Schierioh, Fazio Traina, NDP EMS, American Honda Finance Corporation, Germach Shimon Yisroel, Parkville Medical PC, TIG Brokerage, E Z Pass, Bond Shoeneck & King, Stone River Pharmacy Solutions, Commissioner of Taxation and Finance, Ellis Hospital, Progressive Casualty Insurance CO, Bais Miriam, Focus Inc International Corp, Shmiel Gandeiman, Abraham Grossberg, NY State Employment Tax, Steven J DeLuca, Efraim Langner, Nissan Motor Acceptance Corporation, Avi Kagan, Matrix Insurance Consulting LLC, Reynolds Consulting Group, Consolidated Edison Company of N.Y INC., Jose Gonzalez, Barry R Feerst Associates, Daniel J Hannon & Associates, David Rubinstein, Jaspan - Schlesinger LLP, P. Zigelman, Roso Solomon Co, Admor's Office World Inc., Honda Financial Services, Jeff Cogswell, Economy Leasing, R & G Investment and Ho, Lee S. Dennison P.C., New York Life Insurance Company, Albany Medical Center, Samaritan Hospital, William Fried Inc., 1689 49th Street LLC, NCO Financial Systems Inc, St Johns Emergency Medical, South Hampton Hospital, National Continental Ins Company, The Goldwater Tapin Group, Hillel Kanner Esq., NYC Department of Finance, Donald T Decarlo, Golflow Commerce, Iceberg Data LLC, PF Deer Creek, Trycon Concrete, Ateres Publishing, AT & T Mobility, Golden, Rothschild, Spagnola, Lundell, Abraham Weinstock, Angela Cogswell, G.V Financial Services, NYS Employment Taxes, Arnot Medical Services Ctr For OCC Med, U.S BANK N.A, Capital One Bank, Glicksman Consulting, LLC, Ohel Gideon, UTA of Boro Park, Business Card, Verizon Wireless, Arch Insurance Group, Toyota Financial Services, Avromi Tyberg, Bais Yaakov, Cornell Realty Management LLC, and other persons not yet identified.

121.    Parties in interest were either paid from the scheme, aided in the diversion of funds and assets intended to be held to pay for benefits for injured employees of Employers, or became

principals and instrumentalities in the capitalization, development, chartering and licensing of S & P, persons identified as receiving benefit from the scheme and later were principals in S & P and parties in interest that participated in the scheme and ultimately obtained a position in the takeover vehicle S & P.

122.    The Philipson Family Trust is a holding company which capitalized S & P in joint venture with the Schlesinger Family Trust.

123.    The Schlesinger Family Trust is a holding company which capitalized S & P in joint venture with the Philipson Family Trust.

124.    Gary Baker ("Baker"), a consultant for Allstate and a current member of the Board of Directors of S & P, provided an affidavit in opposition to the litigation described in paragraph 83 of the Complaint sworn to June 17, 2013, identifying as a "holding and management company operating affiliated skilled nursing facilities and the 5 boroughs of New York, and facilities located outside of New York", describing Plaintiff as providing to the Employers a "loss sensitive premium program as opposed to a guaranteed cost premium program. The loss sensitive premium program is commonly used for larger workers' compensation insurance procurements, such as the procurement for the members, because it allows for a reduction in the premium cost for the insured in exchange for some increased loss risk (i.e. a deductible)". Baker in his affidavit states that Muller "was an insurance broker and that he was acting on behalf of and with the authority to bind Oriska Insurance Company to the terms of the agreement he had reached with Allstate." Baker states that "Oriska, through Mr. Muller, induced Allstate to enter into an agreement with Oriska for the provision of workers' compensation benefits for the Members pursuant to a loss sensitive premium program." Baker confirmed that 27.4% of annual premium was to cover Plaintiff's fixed costs, and the balance was to be applied to a "combined loss fund" and the "Sentosa Members would pay a $1 million deductible per loss claim."

125.    Israel Ziegelman, ("Ziegelman") a member of the Board of Directors of S & P, between 2011 and 2013, received payments by wire transfers from the Employers' funds aggregating hundreds of thousands of dollars, to perpetrate the scheme of diverting, converting and embezzling funds intended to pay benefits to the personal use of Ziegelman.

126.    Benjamin Landa ("Landa") is a co-owner and partner with Philipson.

127.    Ira S. Lipsius ("Lipsius") a member of the Board of Directors of S & P, has received payments from Employers funds being held to pay benefits, and it would be incredible if Lipsius did not know the origin of the monies paid into capital of S & P in order to qualify to be licensed as an insurance carrier in New York State. Lipsius is a party in interest to their Plan in that Lipsius is a plan service provider providing legal and accounting services to the Employer Defendants by payments to Lipsius out of the Plan assets for the purposes of developing a business enterprise benefiting Philipson and Schlesinger, which transactions with Lipsius for non-plan purposes are prohibited.

128.    In 2012 and 2013, The Berkshire Group received payments by mailed checks, bank transfers and wire transfers from the Employers' funds aggregating millions of dollars, to perpetrate the scheme of diverting, converting and embezzling funds intended to pay benefits to employees in the Class.

129.    Between 2011 and 2014, Spencer Street Realty received payments from the Plan assets by check mailed or wire transfer to Spencer Street Realty, in an effort to perpetrate the scheme of diverting, converting and embezzling funds intended to pay benefits of Employers employees.

130.    Between 2012 and 2014, Pitterman Trust received payments from the Plan assets. On January 28, 2012, the Pitterman Trust sold to 1689 49th Street, LLC ("LLC") for $10.00 property located at 1689 49th Street in Brooklyn, NY. The LLC is managed by Samuel Schlesinger who signed on behalf of the LLC. On the same date, Pitterman Trust loaned to LLC $499,949.00

for the premises located at 1689 49th Street. On August 13, 2013, a Satisfaction of the Mortgage is filed. The last payment to the Pitterman Trust was made the same date, 8/13/2013 from account 483031636617 routing number 2100032 in the amount of $124,998.00 check/wire 2435, in an effort to perpetrate the scheme of diverting, converting and embezzling Plan assets.

131.    Between 2011 and 2014 Wolf Eisenbach received payments from the Plan assets to perpetrate the scheme. The same property that is discussed in regard to the Pitterman Trust paragraph above, 1689 49th Street was sold by the 1689 49th St. LLC to Wolf Eisenbach in September 2013, one month after the Pitterman Trust loan to the LLC was paid off. Wolf Eisenbach then sold it back to 1689 49th St. LLC on January 8, 2014, in an effort to perpetrate the scheme of diverting, converting and embezzling Plan asset intended to pay benefits of Employers employees.

132.    On April 28, 2011, Allstate ASO c/o Raphael A. Weitzner, Esq., 134 Bedford Avenue Suite, 616 Brooklyn NY, gave a Loan of Plan assets to Chaim Hirsch for the purchase of 727 Bedford Avenue property in the amount of $55,000.00. On 3/9/2011, a withdrawal from Allstate's Bank of America account was taken by Raphael Weitzner as Attorney. A Release was later signed by Israel Weber on October 10, 2011.

133.    Allstate Administrators (the successor company to Allstate ASO) loaned from Plan assets to 1153 44, LLC (managed by Joseph Stern) $75,000.00 for property at 1153 44th Street. Brooklyn, NY. Samuel Schlesinger, the manager of Allstate, notarized Mr. Stern's signature, in an effort to perpetrate the scheme of diverting, converting and embezzling funds intended to pay benefits.

134.    Between 2011 and 2018, Schlesinger is the same person who in partnership with Philipson and their respective family trusts have utilized the Plan assets, which funds were wrongfully diverted to capitalize their new insurance Company. Schlesinger received payments by

checks from the wired Plan assets aggregating millions of dollars, to perpetrate the scheme of diverting, converting and embezzling funds intended to pay benefits.

135.   Michael Schwimmer operated, aided and abetted as a broker for the Employers receiving from Allstate and paying on behalf of the Employer Defendants.

136.   Michael Camilleri was one of the initial directors of S & P with knowledge of the capitalization of S & P. Camilleri was the custodian on March 16, 2016, President, COE and sometimes secretary from the time of chartering on July 19, 2012, and legal counsel on the formation through and past the Organizational Examination May 26, 2017, charged with knowledge of the source of funds into his escrow account which capitalized S & P. Camilleri was replaced by Philipson as President on or about April 20, 2018.

137.   Stella M. Vilardi ("Vilardi"), an accountant at SentosaCare LLC and a current member of the Board of Directors of S & P, who for many years was the principal accountant and especially the trusted accountant for Philipson and his interstate nursing home empire expanding into the states of Oklahoma, Texas, Kentucky and other states still unknown, has been the accountant who executed or caused to be posted the transactions that make up the expenses reported in the Cost Reports as "Workmen's Compensation Insurance". Ms. Vilardi paid invoices from Schlesinger to Allstate. Ms. Vilardi is a current member of the Board of Directors of S & P with knowledge of the expense transactions of Employers, including but not limited to the expenses reported in the Cost Reports for "Workmen's Compensation Insurance".

138.   Martin Schwartzman, a current member of the Board of Directors of S & P, formerly a senior advisor to the Superintendent of DFS, with years of regulatory and financial experience with the NYS Department of Insurance and the DFS, was either misled or knew of the defalcation by the Employer Defendants.

**S & P Insurance**

139.    The Employer Defendants by Philipson began diverting Plan assets to gather the capitalization of an insurance carrier named Standard and Preferred Insurance Company ("S & P") beginning in 2012. In fact, the capitalization was from Plan assets funded by Prohibited Transactions by the Employer Defendants previously identified herein.

140.    Then in a financial examination by the New York State Department of Financial Services, on licensing Standard and Preferred Insurance Company ("S & P") to become licensed as a New York domestic property and casualty insurance Company, the source of funding was from the Employer Defendants from funds that should have been in trust, which is easily identified and determinable by the State Officers if they had traced to the source; but the State Officers failed, intentionally or otherwise, to identify with due diligence the capitalization of S & P, because the State Officers stopped inquiry at the escrow account provided by Calamari.

141.    Parties in Interest aided in the diversion of funds and assets intended to be held in trust to pay for benefits to the Class of employees of Employer Defendants, done at and through the offices of party in interest Lipsius at 80-02 Kew Gardens Rd, Suite 1030, Kew Gardens, NY 11415, where S & P was chartered by State Officers on July 20, 2012, using principals and instrumentalities of parties in interest and Employer Defendants, in the capitalization, development, chartering and licensing of S & P.

142.    Persons who have been identified as receiving benefit from this part of the scheme as principals in S & P, are Philipson and Schlesinger by their family trusts, parties in interest to their Plan effecting and accomplishing the prohibited transactions. The Philipson Family Trust is a holding company which capitalized S & P in joint venture with the Schlesinger Family Trust. The Schlesinger Family Trust is a holding company which capitalized S & P in joint venture with the Philipson Family Trust.

143.     Through means and methods of communications, letters, telephone, evidence of the agreements, parties in interest to their Plan sought and did deny the Class its rights and privileges to the Plan assets.

144.     In November 2017 State Officers finished their examination of S & P Insurance and certified that the capitalization from the Philipson Trust and the Schlesinger Trust were legal in accordance with Article 15 of the Insurance Law. State Officers failed to identify the source of capital to be the Employer Defendants from diverted funds.

145.     State Officers authorized issuance of licenses to S & P Insurance, based on capital that belongs in trust for the Program, a plan that involved the very same insureds and Rashbi Trust known to State Officer Masterson on and before December 1, 2014.

146.     The Employee Class and the Rashbi Trust have been denied the funding to their Plan under color of State law, State rules and regulations used to ratify the scheme, achieving the goal to divert Program funding from their Plan and Trust in prohibited transactions. S & P Insurance received Plan assets, either directly or indirectly traceable to and from the Employer Defendants, funds that should be in trust to secure to collateralize benefits and must be forfeit and disgorged to trust.

## Renunciation of Obligation to pay for Benefits Required by their Plan

147.     As part of the scheme, all under color of law in complicity with State Officers, specifically Martha Lees, over six years after issuance of coverage and acceptance by the Employer Defendants, after the Carrier Defendant Oriska Insurance was terminated by the Employer Defendant on May 1, 2018, the Employer Defendants on September 19, 2019 abruptly renounced and disavowed the coverage provided by Oriska Insurance, claiming the policies were illegal, null, void and of no force and effect. The Employer Defendants refused to secure benefits to the Class, relying principally upon a February 7, 2019 letter to Lipsius from State Officer General Counsel of the DFS Lees.

148.    The Program is offered under Insurance Law §4235 and Insurance Law §3443, Insurance Law §2307, Insurance Law 2306 and section 50 of the Workers' Compensation Law. This singularly unique 24-hour protection Program jointly administers health, disability and workers' compensation coverages to deliver traditional health care, disability and workers compensation services providing a simple, state-of-the-art system of health care delivery. Combining experience caring for the injured and ill with pro-active managed care programs is not only unique, but is also specifically designed for New York State employers needing Accident and Health Insurance, New York Statutory Disability Insurance, Workers' Compensation Insurance, Short-Term Disability and Long-Term Disability, training and safety for an employer's workforce.

149.    On June 11, 2010 BCS (by Muller) wrote the coverage for the Employer Defendants.

150.    Muller was also adjusting and paying the claims of injured workers for the Employer Defendants.

151.    BCS (by Muller) established an off-shore reinsurance program in Bermuda, which was intended to be collateralized by the 114 Trust to secure the deductible retention of obligations of the Employer Defendants where BCS was Administrator of a 114 Trust at TD Bank.

152.    Occurring coincidentally was the DFS 2010 Examination of the Carrier Oriska Insurance.

153.    Beginning on May 18, 2010, the DFS began a routine financial exam of Plaintiff pursuant to Insurance Law 310 ("Financial Exam") for the period September 30, 2005 through December 31, 2010.

154.    On July 1, 2012 State Officers of the DFS were fully advised of the deductible loss sensitive Program retention by the Employer Defendants of the obligation to pay benefits under the deductible in accordance with SSAP 65 paragraphs 34-39, 11 NYCRR 176, making up the Program. Nevertheless, a Report of Examination of Oriska Insurance Company (the "Exam

Report") issued from the New York Department of Financial Services ("DFS" or "Department") alleged that Oriska was insolvent. A draft of that Report was sent to Oriska Insurance Company on June 15, 2012.

155.    On October 29, 2012, the DFS issued its final Exam Report for the Financial Exam, disallowing credit for the off-shore reinsurance, because there was not a proper transfer of risk, and because the trust failed to comply with the regulatory requirements of New York Regulation 114 (11 NYCRR §126), and as a result of the disallowance of the off-short reinsurance found that Plaintiff was impaired as identified in the 2010 Exam Report in the amount of $8,091,480.

156.    On February 1, 2013, the Superintendent of the DFS issued an order pursuant to Insurance Law 1310, citing the impairment identified in the Exam Report, and ordered that Plaintiff could not write any new policies until the impairment had been addressed.

157.    It was the Employer Defendants, their owners and operators who caused the impairment identified in the 1310 Order, by their use of offshore reinsurance and not paying Fund Assets to fund the 114 Trust under the Program as it applies to the Employer Defendants.

158.    On March 20, 2013 BCS was fired as the reinsurer and as the Administrator and Rashbi was reinstalled as the Administrator and resumed its position as grantor of the 114 Trust set up in 2007, as recited in a Settlement Stipulation entered into by the Employer Defendants of September 24, 2013. The first step in complying with the 1310 order was to remove BCS (by Muller) by the Settlement Stipulation on March 20, 2013.

159.    The Employer Defendants breached their fiduciary duties under ERISA by failing to make or arrange for payment of benefits to the Class, by failure to maintain plan assets in a fiduciary capacity, by failing to have adequate policies and procedures in place to monitor the operation of their Plan, by negligently and with malicious ulterior motives described herein, the Employer Defendants diverted, converted and did hide Plan assets rather than place them in trust protection as required by the Program and ERISA.

**DFS State Actions under Color of Law in Support of the Scheme**

160.    Events took place involving the complicity of State Officers in the systematic failure by State Officers to apply justice as described here, they instead aided and abetted as part of the scheme.

161.    On November 23, 2014 by a surplus note pursuant to Insurance Law 1307 issued by the parent of the Carrier Defendant addressed the impairment as ordered by the 1310 Order by paying into the capital of Oriska Insurance of $8,489,800.00, curing the impairment identified in the 1310 Order of $8,091,480. Despite curing the impairment this 1310 Order remains in force as of the filing of this Amended Complaint, as so wrote State Officer Lees on February 7, 2019 to party in interest attorney Lipsius. as described below.

162.    Carrier Defendant Oriska Insurance advised the DFS that the issues in the 1310 Order had been addressed by Response on December 1, 2014 to the Recommendations of the Exam Report, by returning Rashbi as the Administrator of the 114 Trust, and by paid-in-capital to Oriska Insurance to address the impairment identified in the 1310 Order, which was done on November 23, 2014 by a surplus note pursuant to Insurance Law 1307, thereby complying with the 1310 Order addressing the impairment of $8,091,480 caused by the Employer Defendants.

163.    The impairment was caused by the Employer Defendants refusal to abide by the Judgment ("Judgment") of December 14, 2007 of New York State Supreme Court Index case CA2006-001542. The 114 Trust was originally established by the Employer Defendants and their Owner Operators in accordance with and authorized by a decision of Judge Robert Julian of Supreme Court in case CA2006-001542, where the 114 Trust, required to be funded by the Employer Defendants, was determined to be legally sufficient to prove solvency in accordance with the Program approved in 1994 and Statement of Statutory Accounting Principles ("SSAP") 65 paragraphs 34-39, the SSAPs adopted by the State into law at 11 NYCRR 176. Based upon a Stipulation ("Stipulation") in open court of December 10, 2007 pursuant to CPLR 2104, binding

the State on the Record at the time of trial on December 6, 2007, it was agreed that in accordance with Statement of Statutory Accounting Principle ("SSAP") 65 paragraphs 34-39, 11 NYCRR 176 and the 1994 Program approval by the DFS, there was no insolvency due to these accounting principles and as a consequence the receivership action was dismissed with prejudice.

164.    On February 7, 2019, to cover the failure to pay funds to the trust by the Employer Defendants, Lipsius requested and received a letter from State Officer General Counsel Martha Lees, implying that the policies issued to the Employer Defendants violated the Superintendent's Insurance Law 1310 Order are not enforceable, for the use of Lipsius to justify the Employer Defendants not funding the Trust for benefits to the Class.

165.    It was part of the scheme for Employer Defendants, or persons operating and controlling the Employer Defendants, to willfully and intentionally use Fund Assets for purposes other than the exclusive purpose of providing benefits to fund participants and beneficiaries.

**State Officer Lees' Acts as Part of the Scheme**

166.    It was a part of the scheme that, despite the agreement to settle lawsuits in 2007 and 2013 against the Employer Defendants by their agreement to establish a 114 trust, the Employer Defendants failing to fund in trust as was agreed in 2006, the Employer Defendants willfully defrauded and even now continue to defraud the Class by underfunding and diverting assets from the 114 Trust. All this defalcation was justified by the February 7, 2019 letter to Lipsius from State Officer Lees referencing the 1310 Order issued by the Superintendent of the DFS of February 1, 2013, when Lees wrote to Lipsius on February 7, 2019. It would be incredible if Ms. Lees as the General Counsel of the DFS and Mr. Lipsius did not discuss the lawsuits brought by Oriska Insurance to recover accrued premiums from the Employer Defendants, diverted Plan assets earmarked for the payment of benefits, when discussing that the 1310 Order prohibiting Oriska Insurance from issuing policies. This is especially troublesome because Ms. Lees provided an

affidavit on October 23, 2017 in opposition to litigation brought to enforce premium collection lawsuits against the Employer Defendants by Oriska Insurance.

167.    The circumstances justify the conclusion that the policies which were the subject of the letter of February 7, 2019 between Lipsius and Lees, were the same policies issued by Oriska Insurance to the Employer Defendants. Lipsius was seeking support for his clients, the Employer Defendants, to avoid payment of Plan assets to cover liabilities of the Employer Defendants to their employees, the members of the Class. The February 7, 2019 letter from Lees to Lipsius raises the connection that the 1310 Order was discussed between Ms. Lees and Mr. Lipsius. There only reasonable explanation is that Lipsius on behalf of his clients Employer Defendants asked Lees whether the policies were enforceable to obligate the Employer Defendants to pay for medical care, lost wages and expense liabilities, benefits to which the members of the Class, employees of Lipsius's clients Employer Defendants, benefits to which the Class is entitled. Upon request of Lipsius, Lees issued her letter of February 7, 2018 from the office of the General Counsel of the DFS stating that the 1310 Order remains in effect, knowing that the Employer Defendants were seeking to avoid liability for medical care, lost wage and expense benefits to their employees, the Defendant Class.

168.    Any doubt is done away with proof that Lipsius talked with Lees on multiple occasions about the enforceability of the Oriska Insurance policies, and that Lees knew that the Employer clients of Lipsius denied and refused to accept responsibility for their liability under section 10 of the Workers' Compensation Law. Lees as General Counsel of the DFS issued an opinion to Lipsius that the 1310 Order remained in effect. Lipsius took that letter and argued to the New York State Supreme Court that his clients were not required to pay their liability to their employees, attaching and referencing the Lees letter of February 7, 2019. The Supreme Court by Justice MacRae, in deference to the DFS as the expert in issuing the opinion with the force of law of the Letter of February 7, 2019, ruled that the policies were not enforceable and dismissed the

lawsuits brought by Defendant Carrier Oriska Insurance, on motion by Lipsius, citing the Lees appended letter of February 7, 2019, dismissing the lawsuits by Defendant Carrier. It logically follows that Lees knew that Lipsius would use the letter to avoid payment to Defendant Carrier, knowing that relieving the Employer Defendants of liability to pay tens of millions of dollars sued for by the Carrier, the 114 Trust not funded, the DFS under color of law asserting insolvency due to the Carrier Oriska being unable to collect from the Employer Defendants on their liability, Lees had to know that her February 7, 2019 letter would abrogate the obligation of the Employer Defendants to pay their liability to the Class.

169.    If in fact the Employer Defendants are not required to reimburse the Carrier Defendant for payments made to employee Class members, the parent of the Carrier Defendant has derivatively under Business Corporation Law ("BCL") 626 brought the 26 lawsuits referenced herein, subrogating to the rights of the employees under fund or common law rights of subrogation and indemnification, as well as asserting employees' rights under WCL 11 and involving the Uninsured Employer Fund ("UEF"), because it follows that the Employer Defendants were uninsured.

170.    Michael Papa of the General Counsels' Offices of the WCB, jointly, by their own individual communications, requested of General Counsel Lees to issue an opinion letter that renewal of policies was not prohibited by the 1310 Order making the policies enforceable and relieving the UEF.

171.    On Friday, February 14, 2020, Mr. Papa wrote on behalf of the WCB: "I have not had the chance to speak with Ms. Lees since our last conversation as she has been traveling. That said I am told she will be back in the office early next week and I can assure you that she understands your client's desire for are response to your inquiry sooner rather than later." Mr. Hitzke responded on February 14, 2020: "Hello Mr. Papa, I did not hear back from either you or Ms. Lees." Then on Friday, January 24, 2020 Mr. Hitzke, of the one single conversation he was

able to have with Ms. Lees, wrote: "Dear Ms. Lees, it was pleasure speaking with you earlier this week regarding Oriska Insurance Company. As discussed briefly in my discussion with you I am providing my request in writing to obtain a position statement from the DFS on the issue discussed. As a brief back drop as you know Oriska Insurance Company has had a history with the DFS that also resulted in you providing an Affirmation in Index #CA2015-2514 after the issuance of Insurance Law 1310 Order prior to February 13, 2013 [typo February 1, 2013]. Some issues have arisen that require a position statement from you as to whether or not Oriska Insurance Company issuing "renewal Policies" after the issuance of the 1310 Order violated the 1310 Order thus making the policies invalid as a matter of public policy. DFS has never contented so nor have they even raised it as part of the prior litigation and in actuality in your affirmation it is alluded that in Paragraph 12 of said affirmation you write "The fact of the matter is that the DFS has never "failed to recognize" its prior authorization for Plaintiff to issue certain policies, as alleged in the complaint.", the position being taken is that the very same policies written after February 13, 2013 [typo February 1, 2013] violated the Insurance Law 1310 order and thus under Workers Compensation Law are unenforceable. I have advised counsel for the Workers Compensation Board of New York, it is my client's position that the renewal policies have not violated the Insurance Law 1310 Order, and they will continue to pay, adjust and litigate on the close to 1600 workers compensation claims that fall within the alleged violative renewal policies unless and until we receive your position statement to the contrary. I would like to thank you in advance for your consideration of this request, and I look forward to hearing from you shortly."

172.    Then on Tuesday, January 21, 2020 Mr. Papa at the WCB wrote to Mr. Hitzke regarding a meeting by telephone with Ms. Lees: "Hello Michael, I just spoke with Martha Lees. I will be forwarding her an email outlining our request for her to draft a position statement regarding the position of the DFS on the issue if the renewal policies are "new policies" in violation of the1310 Order of the DFS. Our General Counsel is David F. Wertheim and his address is the

same as mine, as I mentioned, keep me in the loop on what Martha says, signed. Michael Papa Deputy Counsel for Compliance and Litigation, NYS Workers' Compensation Board, 328 State Street, Schenectady, NY 12305."

173.    Mr. Papa had written to Mr. Hitzke Friday, December 27, 2019; "nowhere in the oral argument is there any indication from the Court that either the policy itself is void or that the underlying 1060 claims are uninsured. In fact, statements to the opposite effect are clear and unequivocal (see generally pages 5-7). As such, there is no basis whatsoever for your client to simply discontinue payments on these claims. In light of same, please confirm that your client has no intention of discontinuing any payments on these claims absent a written decision from Board authorizing Oriska to take such action."

174.    Mr. Papa wrote to Mr. Hitzke on December 27, 2019: "Based upon your representation that there will be no unilateral cessation of the flow of benefits to the 1060 claimants, I am comfortable waiting until after the new year to allow time for you to obtain the DFS opinion you indicate is forthcoming." Referencing Mr. Hitzke's commitment: "I had advised my client and they have confirmed at this time that they intend to continue to pay out on the claims pending either a decision from the DFS to take the Court or a WCB judge. Yes, after our last discussion and your prior email I advised them as I advised you I would, to take no action until we have had an opportunity to move this matter through the proper channels and process. We are still in the process of obtaining the necessary Opinion letter from the DFS. Please confirm that your client has no intention of discontinuing any payments on these claims absent a written decision from Board authorizing Oriska to take such action. Hopefully, your client will have come to this conclusion already. Further, please provide an update on the status of the DFS opinion referenced below."

175.    Mr. Papa wrote to Mr. Hitzke on December 20, 2019: "During our call of this morning you indicated that, based upon statements made by Judge McRae at oral argument on

Tuesday on a motion to renew and reargue in the Oneida County action (and also supplemented by an opinion from an unnamed third party law firm) Oriska Insurance Company ("Oriska") was considering ceasing payments on the 1060 workers' compensation claims that are the subject of the twenty six coordinated actions. you are hereby directed that under no circumstances is Oriska to unilaterally suspend payments, including but not limited to payments to the claimants themselves, on any of the 1060 workers' compensation claims that are the subject of the twenty six coordinated actions (or any other established workers' compensation claim for that matter) absent a written decision from the Workers' Compensation Board ("Board") authorizing Oriska to do so. In the event that your client chooses to violate this directive, I can assure you that the full weight of the workers' compensation law would be brought to bear upon your client for its reckless disregard of its obligations. What would not be addressed is the issue of whether or not the policies at hand are "renewal" policies, and thus outside the scope of the 1310 Order issued by DFS, or "new" policies and thus within the scope of the 1310 Order. With regard to the latter issue, you have indicated that you have sought such an opinion from the Department of Financial Services (which the Board agrees would be the appropriate regulatory body to answer such a question) and are awaiting a response."

176. Mr. Papa Deputy Counsel for Compliance and Litigation NYS Workers' Compensation Board 328 State Street, Schenectady, wrote to Mr. Hitzke on January 13, 2020 that: "Just seeing this our General Counsel is David F. Wertheim and his address is the same as mine. As I mentioned, keep me in the loop on what Martha says", regarding the memo from Papa of December 27, 2019 "Based upon your representation that there will be no unilateral cessation of the flow of benefits to the1060 claimants, I am comfortable waiting until after the new year to allow time for you to obtain the DFS opinion you indicate is forthcoming. That we are still in the process of obtaining the necessary Opinion letter from the DFS. Once procured I will copy you on the same."

177.    Following up Mr. Hitzke wrote Ms. Lees on February 7, 2020 with copy to 'Papa (WCB)': "As you know I represent Oriska Insurance on various matters. I had emailed you two weeks ago after our call going overissues my client has been facing regarding the "'renewal policies'" that they had written and if the DFS believed that a "'renewal policy'" violated a prior 1310 Order. We are still in need of obtaining your position with respect to the same. If you would like to discuss this matter any further and or need any further information or documentation, please do not hesitate to contact the undersigned at your earliest convenience."

178.    Again, following up, On March 9, 2020, Mr. Hitzke wrote to Ms. Lees @dfs.ny.gov: "Hello Mrs. Lees, as you may recall I represent Oriska Insurance Company. I spoke with you briefly in late January regarding my client. January 21st to be exact. Pursuant to our conversation I forwarded a follow up email requesting a letter reaffirming the position that you had taken in your prior affirmation advising that the DFS did not have an issue with the renewal policies that where subject to an audit. I have left a few messages and a follow up email or two along the way. I was wondering if I can obtain a reply. I actually plan to be in New York shortly and my new office is but just a few blocks from you. If possible, I would appreciate even an opportunity to meet in person if you would oblige such a meeting. I again wish to thank you for your anticipated cooperation and attention to this matter."

179.    And again on April 7, 2020 Mr. Hitzke wrote to Ms. Lees "Hello Mrs. Lees. It has been a bit since I have reached out to follow up with you regarding a reply and or response to my prior emails. I can only assume you have been plenty busy with the present COVID-19 situation in New York. If you are able to provide me the correspondence discussed with myself and Mr. Pappa's from the DWCB that would be greatly appreciated. If you are able to provide me the correspondence discussed with myself and Mr. Pappa from the DWCB that would be greatly appreciated. If you would like to discuss this matter further, please let me know so I can make myself available for your convenience."

180.    Ms. Lees would not issue her opinion letter clarifying her letter of February 7, 2019, clarifying that renewal policies were not "new" policies, and such renewal policies are valid and enforceable, thereby relieving the UEF of liability.

181.    Ms. Lees as General Counsel of the DFS knew everything and asked everything, knew every part to know of all of the facts concerning the Program and its adulterated use by the Employer Defendants for the purpose of diverting funds that should be in trust. The DFS thoroughly investigated the Program and knew all of the intimate details of the self-insured deductible program where the risk of loss was retained by the Employer Defendants. Nevertheless Ms. Lees of the DFS felt injured and attacked by the Carrier and its owner, offended by what she termed an attempted crawl back in her affirmation of October 23, 2017, Ms. Lees was intent upon terminating and liquidating the Carrier and turning the claims over to the Guaranty Fund relieving the Employer Defendants of their liability, a motive and conduct which she knew to be wrong. The DFS felt threatened, ignoring precedent of the resolution of the solvency of the Program in 2007 recognizing the use of the 114 Trust, on the same issues, the same parties with the same facts. The DFS refused to acknowledge the solvency of the Program that requires the Employer Defendants cover their self-insured deductible liability.

182.    The Employer Defendants must be ordered to shoulder their liability, instead of permitting the Employer Defendants to shift their liability to the Guaranty Fund of the State of New York by refusing to fund the 114 Trust to pay benefits to the Class. If the Employer Defendants are not required to fund their liability, tens of millions of dollars of their liability would be released, releasing tens of millions of dollars paid by Medicare and Medicaid on accrued expenses for the liability of benefits to the Class of employees, shifting that liability to the Carrier and then to the Guaranty Fund, an unwarranted windfall to the Employer Defendants, a disenfranchisement of the Class, ultimately leaving the Class to seek public assistance when benefits cease under the Program.

183.    Once Lees had issued her February 7, 2019 General Counsel opinion, she was under a duty to follow up to prevent a miscarriage by the use of her February 7, 2019 letter to prevent the Employer Defendants from using the letter to avoid their statutory liability. Ms. Lees knew that the Program would not survive if the Employer Defendants failed to fund the 114 Trust for reimbursement of benefits to the Class, the effect of which is to shift liability to the Guaranty Fund of the State of New York upon the demise and liquidation of the Defendant Carrier Oriska Insurance. It is reasonable to conclude that Ms. Lees wanted to give the Program the finishing stroke that would terminate its existence, and finally be liquidated and disposed of. Ms. Lees reticence and secrecy is wholly inconsistent with and cannot account that Ms. Lees was acting independently in issuing her letter of February 7, 2019, nothing was more expressive than Ms. Lees' silence.

## SUNY Maritime Interference with Right of Assembly of the Percy Subclass

184.    An aggregate group of State Officers are conducting a "blue list" of persons under suspicion and scrutiny by the Office of the New York State Inspector General. Despite having valid contracts, having paid consideration, and State permits having issued, is a larger scheme culminating years of efforts by State Officers trying to bar the Class and the Percy Program from the State premises, this appearing to be separate State incident. When in fact this interference with the right of the Class to assemble is part of a coordinated effort to deny rights of the Class and the Percy Program protected by the First Amendment to the United States Constitution. The days beginning in 1998 when in the Research Foundation described the apprenticeship as a partnership, are gone, replaced now with interference with the rights of the Class and the Percy Program,

185.    Now, State Officers Scott Dietrich and Peter Fountis with the State University of New York ("SUNY"), seek to bar assembly of the apprentices at the State properties for which the Percy program obtained a permit, a permit grudgingly accepted by the Percy Program after the contract that Percy had with the SUNY Research Foundation for more than 15 years jumped from

$5,000 for a scholastic year in 2015 to $180,000 in 2018, later compromised to $30,000 with Percy being issued Revocable Permit.

186.    Now under that Permit, SUNY Officers are refusing to acknowledge receipt of payment by the Percy Program for the 2020/21 classroom year, alleging SUNY did not receive the fully executed Permit from Percy, State Officers using this false pretense to bar Percy from assembling and conducting classes at SUNY Maritime, all the while ignoring that the Percy Class is committed to abide by the Governor's Orders that govern classes at the SUNY Maritime campus during the COVID-19 virus crisis.

187.    When on October 23, 2020, the State after receiving and accepting full payment from the Program for the Revocable Permit, now the State refuses to recognize the Revocable Permit. This culminates efforts to terminate the apprenticeship Program on the campus of the SUNY Maritime College. This is happening after cancellation of the partnership agreement with the Research Foundation and the Plaintiff herein, replacing the partnership with a Revocable Permit. Refusal to allow employees of the Program to assemble at Maritime College State property is not justified by the current COVID-19 pandemic, and warrants the Court declare that the Program, which is the subject of this litigation, be allowed to exist, and enjoining the assault by State Officers in an effort to terminate the Program. Any doubt as to the motive behind these continuing assaults on the Program, coupled with the actions of State Officers with the DFS as recited in this Amended Complaint, are not just a coincidence.

## Alternative Employment Practice

188.    This Cause of Action is on behalf of a sub-class of the Class herein involving liability of the Employer Defendants for unlawful discriminatory employment practices, the sub-class being "black or Spanish-surnamed persons who are capable of performing, or capable of learning to perform" in skilled occupations (herein the "Percy Sub-Class") entitled to apprentice training and continuing education in safety and skills. The Percy Sub-Class herein is united in

interest with the class as certified in Percy v. Brennan reported at 384 F Supp 800 of November 8, 1974. Case 73-cv-04279 (the "Percy Class").

189.    Members of the Percy Class are undertaking to enforce the Percy Class Settlement in Case 73-cv-04279, now the "Alternative Employment Practice" pled herein, an action to be filed in the US Federal Court for the Eastern District of New York against defendant State of New York and others, for failure of settlement involving New York State Executive Order 45 (9 NYCRR 3.45) ("EO 45") for enforcement of the Settlement. The Percy Class action is pending identification of the current members of the Percy Class with a reasonable degree of certainty using census records and other cultural scoring to identify Percy Class Members.

190.    This action contains an element of the Percy Sub-Class's ability to meet its burden of production and persuasion proving it has demonstrated a less discriminatory alternative method of employment practice ("Alternative Employment Practice") causing violation of 42 U.S.C. §2000e-2 by the Employer Defendants for continuing discriminatory unlawful employment practices. The demonstration on behalf of the Percy Sub-Class is in accordance with the law as it existed on June 4, 1989 with respect to an Alternative Employment Practice, described in subparagraph (C) referred to by subparagraph (A)(ii) of 42 U.S.C. §2000e-2(k)(1). The Employer Defendants have refused to adopt such Alternative Employment Practice without valid justification, violating 42 U.S.C. §2000e-2 of the Civil Rights Act of 1964 as amended in 1991.

## Precedent and Jurisdiction to Enforce the Alternative Employment Practice

191.    This action is grounded on the record in US SDNY Case 73-cv-04279, the case file archived as potentially of national significance in St. Louis, Missouri, the case file returned from St. Louis to the National Archives in New York City, returned upon the request on behalf of Plaintiffs, and certified by the National Archives to the United States District Court for the Southern District of New York, which record was then filed by ECF as the Docket on Appeal to the United States Second Circuit Court of Appeals in appeal 17-2273.

192.    That action is grounded upon the final and enforceable Memorandum/Order ("Memorandum/Order") of Judge Lasker reported at 384 F Supp 800 of November 8, 1974. Case 73-cv-04279 was settled on May 4, 1977 by agreement accepting Defendant New York State's offer of EO 45. The problem is that EO 45 failed and the Sub-Class was never notified.

193.    Liability is for violation of 42 U.S.C. §§2000e-2, rights secured to the Percy Class as the Complaining Party, liability of the Employer under the 5th and 14th Amendments to the United States Constitution, 42 U.S.C. §§§§ 2000e-2, 1981, 1983, 1985.

194.    The Alternative Employment Practice under the Civil Rights Act of 1964, and specifically 42 USCA §2000e-2 and §2000d as amended in 1991 (the "Civil Rights Act"), is delivered with workers' compensation coverage. All employment is required to be covered by workers' compensation. Along with the payment of benefits to cover injury and death while on-the-job as required under New York Workers' Compensation Law §10, workers' compensation coverage also includes safety training and loss control management.

195.    The Plaintiff demonstrated the Program to the Employer Defendants as the Oriska 24 Hour Protection Program (the "Program"), adopted as a Program by the Employer Defendants as an Alternative Employment Practice. The Alternative Employment Practice answers the need for the Percy Class to obtain competitive skills by utilizing registered apprenticeship meeting the requirements of the Fitzgerald Act (29 U.S.C. § 50 commonly known as the National Apprenticeship Act of 1937, section 1 (29 U.S.C. 50) under U.S. Department of Labor's Office of Apprenticeship and Training (BAT) and 29 C.F.R, Subt. A, Pt. 29 and Pt. 30. Apprenticeship is the process of learning a skilled occupation through both on-the-job training (practical, paid experience) and learning the related technical knowledge in a classroom. Candidates must be 18 years old and possess a GED (the Alternative Employment Practice will help a candidate obtain a GED). Enrollment must be done openly under the procedures established by federal and state regulations for Minimum Qualifications Review and Eligibility List Ranking using for:

educational achievement, work experience, seniority, job aptitude, oral interview, and general demographic inquiries to determine a score for ranking for eligibility to be enrolled in OJT and continuing education.

196.    The Program covers: Health, Statutory Disability, Workers' Compensation, including Employer's Liability, Apprenticeship under the National Apprenticeship Act of 1937 as approved by the NYSDOL, in a 24 hour portfolio of coverages by deductible loss sensitive self-insured retention of obligations by insureds. The Program offers a unique 24-hour protection portfolio, only available through the Program because of its access to singular licensing for health and disability, along with worker's compensation, allowing joint administration of health. Traditional health, disability and workers' compensation services are delivered in the Program in such a way that costs will be reduced while providing employees with a simple, state-of-the-art system of medical care delivery. Caring for the injured and ill combined with pro-active managed care programs is not new, but here is also specifically designed for New York State employers.

197.    When an employee needs emergency medical care, or is in need of routine medical care or hospitalization, under the Program, the employee immediately receives care under the Program covering both non-work related or work related needs for medical care, the care is immediately authorized under the Program; the issue of whether the incident is work-related or non-work-related is adjusted in the administration of the program in allocating benefit costs, but because benefit payments come from the fund there is no denial of benefits as occurs when carriers compete to shift responsibility by denial of benefits; benefits are paid from the same Plan assets without regard to the incident that caused the need for benefits.

198.    The Program uses workers' compensation coverage to deliver apprentice training and continuing education in safety and skills for the Alternative Employment Practice to provide apprenticeship for new hires and continuing education for existing employees as members of the Class which includes the sub-class Percy Class. The Alternative Employment Practice provides

skills to educate workers to competently and safely perform work, protect themselves and people with whom they come into contact. Too long the sub-Class has struggled without being provided the skills necessary to protect themselves and the communities they serve, including the general public with whom they come in contact.

199.    The Program adopted as their Plan contained apprenticeship programs in the Alternative Employment, incorporating apprentice training into the workers' compensation loss control and safety training of employees, by enrolling new entrants to the workforce to work alongside existing journeypersons, growing the depth of skilled workers, skilled workers whose ranks are being diminished through age and attrition. The Program subsidizes the apprenticeship programs by recognizing the savings in reduction of losses which reduces the exposures and liabilities of the claims. The Alternative Employment Practice is delivered as a function of safety and loss control management through paid on-the-job apprentice training and continuing education involving apprentice training under the Fitzgerald Act (29 U.S.C. §50 commonly known as the National Apprenticeship Act of 1937, section 1 (29 U.S.C. 50) under U.S. Department of Labor's Bureau of Apprenticeship and Training (BAT) and C.F.R. T. 29, Subt. A, Pt. 29 and Pt. 30, made a part of workers' compensation coverage required of all employment.

200.    The Percy Sub-Class of the Class in this action, and the Percy Class as a whole, has been constantly denied access to apprenticeship to gain skills to compete for employment, entitling the Percy Sub-Class to actual damages for lost wages, for lost opportunity compensation, damages also affecting members of the Sub-Classes' children and families, significantly disadvantaged in education and skills, struggling to get a job.

201.    The Program presented as the Alternative Employment Practice, is delivered as a function of safety and training with workers' compensation under the covered payroll. The Program is an Alternative Employment Practice, an element of a workers' compensation coverage. Apprentices are recruited and sponsored through employment or provided through a subcontract

with apprentice training under the National Apprenticeship Act of 1937 occurring by three methods: (1) coordinated with joint apprenticeship labor-management counsel involving unions, (2) by sponsorship by an employer, or (3) by sponsorship by a trade association. Apprenticeship is a function of safety training and loss control management of workers' compensation insurance in the Alternative Employment Practice.

202.    All employment is required to be covered by workers' compensation. Along with the payment of benefits to cover injury and death while on-the-job as required under New York Workers' Compensation Law §10. This Alternative Employment Practice of apprentice training is covered as part of workers' compensation coverage as registered apprenticeship with risk-management, safety training and loss control.

203.    The Plaintiff has met its burden of production and persuasion to the Employer Defendants, proving that there is a less discriminatory alternative method of employment practice available that the Employer Defendants could have adopted. Failing to adopt the Alternative Employment Practice without valid justification is an unlawful employment practice violating 42 U.S.C. § 2000e-2(k)(1)(A)(ii) and (k)(1)(C) of the Civil Rights Act of 1964 as amended in 1991.

204.    The Alternative Employment Practice answers the need for the Percy Sub-Class and the Percy Class as a whole, to obtain competitive skills by utilizing registered apprenticeship meeting the requirements of the Fitzgerald Act (29 U.S.C. § 50 commonly known as the National Apprenticeship Act of 1937, section 1 (29 U.S.C. 50) under U.S. Department of Labor's Office of Apprenticeship and Training (BAT) and 29 C.F.R, Subt. A, Pt. 29 and Pt. 30. Apprenticeship is the process of learning a skilled occupation through both on-the-job training (practical, paid experience) and learning the related technical knowledge in a classroom. Candidates must be 18 years old and possess a GED (the Alternative Employment Practice will help a candidate obtain a GED). Enrollment must be done openly under the procedures established by federal and state regulations for Minimum Qualifications Review and Eligibility List Ranking using for:

educational achievement, work experience, seniority, job aptitude, oral interview, and general demographic inquiries to determine a score for ranking for eligibility to be enrolled in OJT and continuing education.

## OSHA

205.    The Percy sub-class of "black or Spanish-surnamed persons who are capable of performing, or capable of learning to perform" in skilled occupations (herein the "Percy Sub-Class") is entitled to apprentice training and continuing education in safety and skills. The Percy Sub-Class herein is united in interest with the class as certified in Percy v. Brennan reported at 384 F Supp 800 of November 8, 1974. Case 73-cv-04279 (the "Percy Class").

206.    OSHA requires the Employer Defendants to comply with safety and health standards and regulations promulgated by OSHA to provide their employees with a workplace free from recognized health hazards likely to cause death or serious physical harm taking steps to reduce workers' risk of exposure to the coronavirus, among other exposures. The Employer Defendants have refused the Alternative Employment Practice which includes an infectious disease preparedness and response plan under the Alternative Employment Practice incorporated into a welfare plan to protect and take action in this time of extreme emergency because of the COVID-19 pandemic.

207.    Members of the Percy Class are undertaking to enforce the Percy Class Settlement in Case 73-cv-04279, now the "Alternative Employment Practice", an action against State of New York and others, for failure of settlement involving New York State Executive Order 45 (9 NYCRR 3.45) ("EO 45").

208.    This Action is based on Percy Sub-Class's ability to meet its burden of production and persuasion proving it has demonstrated a less discriminatory alternative method of employment practice ("Alternative Employment Practice") causing violation of 42 U.S.C. 2000e-2 by the Employer Defendants for continuing discriminatory unlawful employment practices. The

demonstration on behalf of the Percy Sub-Class is in accordance with the law as it existed on June 4, 1989 with respect to an Alternative Employment Practice, described in subparagraph (C) referred to by subparagraph (A)(ii) of 42 U.S.C. § 2000e-2(k)(1). The Employer Defendants have refused to adopt such Alternative Employment Practice without valid justification, violating 42 U.S.C. § 2000e-2 of the Civil Rights Act of 1964 as amended in 1991.

## Injured Employee Class Members

209.    Class defendants' injuries resulted solely from Employer-Defendant Hamptons's negligence in that the Employer-Defendant failed to provide a safe place to work, neglected to promulgate and enforce reasonable safety rules, and was otherwise negligent.

210.    Solely as a result of Employer-Defendant's negligence, Class defendants were personally injured, suffered pain and suffering, lost earnings and incurred expenses for care and treatment.

211.    Class defendants' injuries arose out of and in the course of Class defendants' employment with the Employer-Defendant Hamptons.

212.    The amount of damages sought in this action exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

213.    The Employer-Defendant is required by law to provide workers' compensation coverage for its Class defendants pursuant to Workers Compensation Law ("WCL") §3(1).

214.    WCL §§10 and 50, allows employers to satisfy this requirement by insuring and keeping insured the payment of such compensation with an insurance carrier authorized to transact Workers Compensation insurance in the State of New York.

215.    As a result of a report on examination as of December 31, 2010, which determined the Carrier-Defendant's capital was impaired, pursuant to N.Y. Ins. Law § 1310, Assets and Deposits – Impairment of a Stock Insurer, on February 01, 2013 the Superintendent, ordered:

ORDERED, that, without limiting in any way the Superintendent's ability to seek rehabilitation or liquidation of Oriska prior to such date, Oriska shall take such steps as may be necessary to remove the impairment of its capital stock and its minimum surplus to policyholders no later than March 15, 2013, or such other date as the Superintendent deems appropriate; and it is further

ORDERED, that, until further order of the Superintendent, Oriska shall not issue any ***new*** insurance policies while the impairment identified here continues to exist. [Emphasis Added]`

216.    On November 24, 2014, capital of $8,489,800.00 was contributed as paid-in-capital to the Carrier-Defendant. The NY Supreme Court by decision dated April 12, 2017 in case CA2016-000666, determined that the impairment was addressed by the infusion of this over $8 million by the use of a surplus note as allowed by N.Y. Ins. Law § 1307, it was not appealed and is final.

217.    The Carrier-Defendant is current with all regulatory filings required by the DFS and that the Carrier-Defendant for the period January 2012 through June 2019 has filed all required annual statements, audited financial statements and quarterly reports with the DFS.

218.    The DFS is aware of the Carrier-Defendant's continued operations and issuance of renewal Policies to the Employer-Defendant and others, is evidenced by the fact the Carrier-Defendant and the DFS have engaged in extensive communication since February 2013, including during a current routine Exam being conducted by the DFS.

219.    The Employer-Defendant's insurance was first issued by the Carrier-Defendant prior to February 01, 2013 with no break in coverage thereafter until 2018; the Carrier-Defendant continued to renew the coverage until the Employer-Defendant canceled the coverage on May 1, 2018, albeit that the cancellation were not in accordance with N.Y. Ins. Law § 54 of the Workmen's Compensation Law (not by certified mail with the requisite notice and statement of grounds for the cancellation).

220.    On September 19, 2019, the Employer-Defendant renounced and disavowed the Workers Compensation insurance provided by the Carrier-Defendant.

221.    Upon information and belief, the Employer-Defendant failed to otherwise secure the payment of compensation for its injured employees and their dependents as required by WCL §50.

222.    When the Class defendants were hurt, the Employer-Defendant allegedly had no workers' compensation policy in effect, even though the Class defendants named herein chose to file workers' compensation claims, the Employer-Defendant was notified of the indexing and establishment of the claims wherein the Carrier-Defendant was designated as the Carrier.

223.    Because the Employer-Defendant allegedly did not have Workers Compensation coverage in accordance with WCL §50 by the Employer-Defendant's own making, the Employer-Defendant is liable for the actual cost of medical care and compensation payments, in addition to other penalties as allowed by the WCL.

224.    Because the Employer-Defendant has allegedly failed to secure workers' compensation coverage, the Shareholder/Directors as the WCL §§26(a) and 52 equivalent of the president, secretary or treasurer of the Employer-Defendant and are jointly and severally liable with the Employer-Defendant are also personally liable for the medical care, compensation payments, penalties and possible criminal prosecution. (WCL §26-a).

225.    Notice was given by the Class defendants claiming entitlement to compensation as shown above for each respective Class defendant.WCL§18.

226.    The Employer-Defendant was notified as shown above for each respective Class defendant by the WCB that the case has been indexed against the employer.

227.    The Employer-Defendant, or a third party designated by the employer, recorded the injury or illness incurred by its employees out of and in the course of employment using a form prescribed by the WCB for reporting injuries under WCL §110(2). WCL §110(1).

228.    Payments began in the normal course on the 14th day of disability and is payable by the Employer-Defendant and succeeding compensation is payable bi-weekly, WCL §25(1)(b), this was paid by the Carrier-Defendant.

229.    An Employer-Defendant's liability under the statute is the exclusive remedy of the injured or deceased employee or one claiming under the employee such as the Class defendants, WCL §11, with the following exception: (a) Failure to maintain coverage. Where employer has not secured compensation for his employees and their dependents as provided in WCL §50, the employee may either claim compensation under the Workers' Compensation Law or bring an action for damages caused by the injury. The defenses of contributory negligence, assumption of risk or negligence of a fellow servant are not available to the employer. WCL §11.

230.    The Employer-Defendant must provide worker's compensation coverage for employees by means of one of the following:

a.  Policy purchased from State Insurance Fund. WCL §50(1).

b.  Policy purchased from an authorized insurance company. WCL §50(2).

c.   Self-insurance after providing to the chair of the Workers' Compensation Board satisfactory proof that the employer is capable of meeting payment obligations for workers' compensation. WCL §§50(3) and (5).

d.  Group self-insurance. WCL §50(3-a).

None of which was done by the Employer-Defendant.

231.    The consequence of failure to secure compensation, criminal and civil liability and penalties, may be imposed under WCL §52 as the Uninsured Employer Fund administers and pays the benefits due to Class defendant injured employees of the Employer-Defendant uninsured employer.

232.    The foregoing claims for injuries of Class defendants resulted in claims paid by the Carrier-Defendant on behalf of the Employer-Defendant Hamptons of $2,827,082.94 and reserves of $396,099.16 for a total of $3,223,182.10.

233.    Assessments were paid to the State of New York by the Carrier-Defendant on behalf of the Employer-Defendant for the Uninsured Employers Fund and other funds of $467,887.96.

234.    The reserves for future claims as reported by Carrier-Defendant, actuarially determined by a Fellow of the Actuarial Society for the insurance contracts issued to the Employer-Defendant is case reserves of $396,099.16 and incurred but not reported reserves of $1,983,903.41.

235.    The Employer-Defendant has enjoyed the benefits the Workers Compensation and Employer Liability Insurance that they now have renounced and abandoned, not only did they avoid significant civil and criminal penalties associated with a lack of coverage, Employer-Defendant's injured employees have been paid millions of dollars by Carrier-Defendant and payments will be required long into the future on claims that have been noticed, indexed and established by the WCB.

236.    The Employer-Defendant has not paid the annual premium stated in the Workers Compensation and Employer Liability Policy that the Employer-Defendant has renounced and abandoned.

237.    The Employer-Defendant accrued and expensed the cost of workers compensation insurance of $3,610,888.00 on their Nursing Home Cost Report ("RHCF"), a uniform report completed by New York skilled nursing facilities to report income, expenses, assets, liabilities, and statistics to the Department of Health (DOH), under DOH regulations (Part 86-2.2). The data filed is part the RHCF filed with New York State Department of Health and the Center for Medicare and Medicaid. The Employer-Defendant has diverted to themselves $1,126,223.64 at taxpayers' expense that was a reimbursable cost from Medicare and Medicaid for workers

compensation insurance premium which the Employer-Defendant received but did not pay the Carrier-Defendant for the workers compensation coverage Carrier-Defendant provided.

238.    The Plaintiff has attempted to secure initiation of this action by a demand upon the Carrier-Defendant Oriska Insurance Company by request to the Board of Directors of Oriska Insurance Company pursuant to BCL §626. However, Oriska Insurance Company has refused to undertake the causes of action as set forth in this Complaint as the causes of action here are in direct conflict with defenses raised in litigation between Oriska Insurance Company and the Employer-Defendant in case 2017-002219.

## Numerosity

239.    The real parties in interest are the Class of employees of the Employer Defendants.

240.    The number of members of the Class are essentially unenumerable but are not indeterminate. The members of the Class can be identified by payroll records, 940 and 941 reports to the Internal Revenue Service, and NYS 45 Reports to the State of New York filed by the Employer Defendants.

241.    There are two subclasses to the Class:

First- the sub-class of the Class being all employees injured on the job while working for the Employer Defendants.

Second- the sub-class of the Class being "black or Spanish-surnamed persons who are capable of performing, or capable of learning to perform" in skilled occupations (herein the "Percy Sub-Class") entitled to apprentice training and continuing education in safety and skills.

242.    Both sub-classes are united in interest with the Class.

243.    The Class Defendant of Employees replaces the redacted names of persons listed as Defendant Employees, to protect the confidentiality of the individuals by proceeding as a Class of Employees entitled to benefits. Donna Hodge, Annette Hall, Karen Grant Williams and Alexi Arias are the class representatives of the Defendant Class.

244.    There is a commonality of the members of the Class as participants in a welfare plan sponsored by the Employer Defendants , for health, disability and workers' compensation, apprenticeship, training, continuing education, safety benefits.

## Common Issues of Law and Fact

245.    The issues of law and fact determining the claims of the Class, that the actions of the Defendant Employers named in this action and the tag-along actions, have caused, are causing, and will continue to cause serious, permanent and irreparable economic and social injury and damage to the Class, are common to all members of the Class.

246.    The common issues of law and fact must be determined by this Court in order to fashion an appropriate equitable remedy and provide equitable relief for the benefit of the Class.

## Judicial Economy

247.    This action avoids the prosecution of separate actions by multiplicity of actions involving the same individual members of the Class against the Employer Defendants which would create a likelihood of inconsistent or varying adjudications with respect to individual members of the Class.

## First: Cause of Action against the Employer Defendants as Plan Sponsor Fiduciaries to Recover Plan Assets Diverted by Parties in Interest in Prohibited Transactions

248.    All the allegations previously stated are re-alleged and incorporated herein.

249.    The Class seeks disgorgement and recovery of Plan assets into trust for the benefit of the Class as Program participants in an amount as will be determined at trial.

250.    A scheme has been perpetrated by the Employer Defendants and parties in interest ("parties in interest" or "party in interest Prohibited Transaction Defendants") involving the illegal diversion of Plan assets.

251.    Plaintiff brings this action to recover the Plan assets into trust for the payment of benefits to the Class, and for disgorgement of Plan assets to trust by permanent injunctions,

imposition of a constructive trust, restitution, and disgorgement pursuant to §502 of the Employee Retirement Income Security Act of1974 ("ERISA"), 29 U.S.C. § 1132, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

252.     According to the Complaint in Nassau County action 609877/2019, the Plaintiffs, the employers of the injured employees, believed that Plan assets were used to cover the Employer Defendants' liability, allegedly not knowing that the fund was wrongfully taken and stolen by the Philipson Defendants for their own personal use. Nevertheless, the Employer Defendants are liable to their employees for benefits covered by the Program. The fund to cover this liability is the $53 million identified in the Complaint in this Nassau County case 609877/2019, as stated in the Amended Intervention Complaint which has been removed to the Federal Court Eastern District of New York, Case No. 2:20-cv-06291 at Docket #2, document #1.

253.     Oriska Corporation, the Plaintiff and the Plaintiff in the enumerated 26 lawsuits, is asserting rights of subrogation for the medical care and indemnity including lost wage and expense reimbursement paid and to be paid long into the future to Class members who have been injured and are entitled to benefits, as set forth in the 26 lawsuits referenced herein.

254.     Employer Defendant attempted to bury the $53 million, using the Court to sanction that the $53 million is only $50 thousand, cutting off the 1060 third party injured employees' access to the $53 million fund, replacing the $53 million fund with $50 thousand, hiding and secreting the $53 million fund off-shore, a fund intended to cover the Employer Defendants' liability. The Employer Defendant to this action tried to reduce the $53 million fund to $50 thousand by amendment of the Complaint in Nassau County Action 609877-2019 after learning of the liability of $88,780,656.83 to the 1060 injured employees, and are now attempting to hide the $53 million spoils, spoils resulting from diversion and conversion of Plan assets expensed by the Employer Defendants. This action seeks to hold the Employer Defendants responsible for their

liability and Obligations to their Plan. This action seeks to reach the $53 million fund to cover the Obligations of their Plan.

255.     The Employer Defendants allege in their Complaint in Nassau County litigation Index 609877/2019 that they unknowingly paid supposed insurance premiums into insurance entities owned by Bent Philipson, for what the Employer Defendants thought was third-party insurance coverage. Philipson then arranged for a third-party insurance broker to invoice Employers for payments which Philipson misrepresented to be entirely for premiums owed. Philipson did this through fraudulently invoicing and diverting over $53 million in his fraudulent scheme. Philipson caused insurance invoices to be issued to each of the Employer Defendants while Philipson was in control of the Employer Defendants. Philipson's fraudulent insurance scheme invoiced Employer Defendants for premium that Philipson's insurance entity was collecting as alleged premium payments, although Philipson did not intend on procuring insurance coverage. The facts pled in the Complaint in Index 609877/2019 are that Philipson secretly used the funds paid into their Plan. The premium payments paid by the Employers "were paid toward third-party insurance providers, and the majority of the premium payments were diverted to Philipson's secret insurance entity to fund his own insurance vehicle". The Complaint in Index 609877/2019 sets forth facts that Philipson formed his own insurance entity and that his insurance entity was the insurance provider to Plaintiffs/Defendants, wrongfully diverting funds away from Employers into his secretly formed insurance entity.

256.     The Employer Defendant must be compelled to pay into trust their portion of liability to the Plan, admitted by the Employer Defendant to be the $53 million fund sought in Nassau County Action 609877/2019, Plan assets lost by the Employer Defendant, to be paid to trust to cover benefits under the Program, individually tabulated by prorating the Employer Defendant's estimated payroll to the payroll of all Employer Defendant in the Nassau County Action, as follows:

| Employer Defendant | Diverted Plan Assets |
|---|---|
| Hamptons | 4,694,262.29 |

**Second: Cause of Action Against Certain Identified Employer Defendants by the Plaintiff Derivative to the Defendant Carrier and in Subrogation to the Class Defendant for Denial of Benefits under an ERISA Plan or Program**

257.    All the allegations previously stated are re-alleged and incorporated herein.

258.    The Plaintiff is subrogated to the rights to be reimbursed for benefits provided to Plan beneficiaries, the Class, who have suffered and will continue to suffer damages including, but not limited to, not having the costs of medical treatment paid.

259.    Certain Employer Defendants are liable to their injured employees under WCL §10. The fund to cover this liability is the $53 million identified in the Complaint in this Nassau County Case 609877/2019, as stated in the Intervention Complaint which was filed at Docket #7 of Nassau County case 609877/2019.

260.    Oriska Corporation, the Plaintiff is asserting rights of subrogation for the medical care and indemnity including lost wage and expense reimbursement paid and to be paid long into the future to the injured Class defendants by its subsidiary Carrier-Defendant Oriska Insurance, as set forth in the 26 lawsuits.

261.    Identified Employer-Defendants are liable to their employees to pay or provide compensation for disability or death from injury arising out of and in the course of their employment. Plaintiff Oriska Corporation is subrogated to the rights of a sub-class of the Class who are injured employees of the Employer Defendants, for the benefits paid and payable to the injured employees by the Carrier Oriska Insurance.

262.    Plaintiff derivatively to Oriska Insurance under BCL 626 has a statutory right of subrogation in this action based on WCL 29, and common law equitable rights of subrogation, indemnification and contribution, because it made payments to and on behalf of the injured employees medical care, treatment and indemnity for lost wages and expenses.

263.    The deductible reimbursement due from the identified Employer Defendants for benefits already paid under the Program, were intended to be covered by funds in the 114 Trust. But because the Employer Defendants have failed to fund the 114 Trust, the Administrator of the Trust, Rashbi Management, Inc., has been unable to reimburse these benefits paid by the Carrier as identified in the 26 lawsuits. Plaintiff, Oriska Corporation has sued derivatively on behalf of the Carrier Defendant and in subrogation to the rights of the injured employees for benefits paid to the Class.

264.    The Employer Defendant has failed and refused to reimburse the Carrier Defendant for benefits paid to injured employees covering the liability of the Employer Defendant under Workers' Compensation Law 10 for benefits already paid to the Class; this does not include future benefits for which their Plan and the Class are seeking payment of funds into trust, these are obligations of the Employer Defendant covered by the Program which are the liability of the Employer Defendant as follows:

| Employer Defendant | Subrogation Amount |
|---|---|
| North Sea/Hamptons | $511,032.24 |

## Third: Cause of Action against Certain Identified Employer Defendants for Denial of Benefits for Failing to Fund the Trust under an ERISA Plan or Program

265.    All the allegations previously stated are re-alleged and incorporated herein.

266.    The Program is established or maintained by Employer Defendants engaged in commerce or in any industry or activity affecting commerce. Under 29 U.S.C. § 1003, as an "employee benefit plan" defined as a "welfare benefit plan" under 29 U.S.C. § 1002(3). The Program was "established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise.

267.    Their Plan meets the five prerequisites for ERISA welfare benefit plan: (1) plan, fund or program, (2) established or maintained, (3) by employers, (4) for purpose of providing for

health, statutory disability, workers' compensation, apprenticeship, training, continuing education, safety to participants or their beneficiaries of the Employers.

268.   The assets of their Plan which are governed by the Employee Retirement Income Security Act of 1974 (ERISA) may be used only for two purposes: (1) to pay benefits to participants and beneficiaries, (2) to pay the reasonable expenses of administering their Plan.

269.   The Class named as a defendant herein is the real party in interest with standing to sue under ERISA Section 502(a)(2) for relief under ERISA Section 409, 29 U.S.C. § 1109 and Section 409(a).

270.   The Employer Defendants are plan sponsors of the Program.

271.   The Class asserts claims for relief for benefits under the Program.

272.   A sub-class of employees (the "Defendant Sub-Class") is those injured on the job while working for the Employer Defendants.

273.   Under ERISA, their Plan is required to be administered "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of … providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1).

274.   Employer Defendants have intentionally and without reasonable justification wrongfully denied and refused to fund and reimburse the payment of benefits to members of the Class in accordance with the Program and by failing to maintain their Plan assets in a Plan trust to provide payment for such benefits, in Violation of the Program and in violation of ERISA.

275.   Plaintiff on behalf of the Class prays for a judgment against the Employer Defendant to disgorge and forfeit Plan assets to Trust as follows:

| Employer Defendant | Due to Trust |
| --- | --- |
| Hamptons | $2,277,826.27 |

## Fourth: Cause of Action in the alternative against Certain Identified Employer Defendants to Recover $65,873,144 in Diverted Plan Assets

276.   All the allegations previously stated are re-alleged and incorporated herein.

277.   $65,873,144 has been lost on Prohibited Transactions during the period covering June 11,2010 through May 1, 2018 due to the intentional or negligent acts of the Employer Defendants under the control of Philipson and/or SentosaCare LLC (this involves the Plaintiffs plus additional Employer Defendants under the control of Philipson) in failing to protect their Plan assets and maintain the Plan assets in trust for Program purposes.

278.   Upon information and belief, the $65,873,144 overlaps the $53 million set forth in the First Cause of Action.

279.   The $65,873,144 has been lost to Prohibited Transactions, not providing benefits to the Class. Instead of the $65,873,144 being maintained in trust, the $65,873,144 has been diverted, Plan assets which have been converted and stolen away employee benefits from their Plan due to the intentional or negligent acts of the Employer Defendants and their Owner Operators.

280.   This $65,873,144 liability of the Employer Defendants to their Plan, is in the alternative to some of those Employer Defendants which are also Plaintiffs in this Action calling for the disgorgement by the Plaintiffs of the $65,873,144.

281.   The several liability of each Employer Defendant to be paid to trust to cover benefits under the Program, prorated be the Employer Defendant's estimated payroll as a ratio to the payroll of all Plaintiffs in the Nassau County Action Case 609877/2019. The Employer Defendant and their percentage of the $65,873,144 that was allocated to each Plaintiff, is as follows:

| Employer Defendant | Diverted Plan Assets |
| --- | --- |
| Hamptons | $4,025,361.70 |

## Fifth: Cause of Action against Owners Operator Defendants of Identified Culpable Employer Defendants for Breach of ERISA Fiduciary Duties in the Diversion of $65,873,144 in Plan Assets

282.   All the allegations previously stated are re-alleged and incorporated herein.

283.     Upon information and belief, the amounts recoverable in this Sixth Cause of Action overlap the amounts recoverable in the Fifth Cause of Action insofar as the Fourth Cause of Action overlaps the First Cause of Action.

284.     The Owner Operators in control of the Plaintiff/Employer Defendants identified in the First Cause of Action are individually liable in damages in the share that they have received by direct payment or accounting considerations in corporate distributions as follows:

Owner Operators

| | | |
|---|---|---|
| a. | Aaron Brecher | $138,284.14 |
| b. | Alan Chopp | $90,310.70 |
| c. | Ben Landa | $40,310.95 |
| d. | Ben Philipson | $2,700,138.01 |
| e. | Benjamin Fishoff | $807,738.26 |
| f. | Benjamin Landa | $6,631,760.62 |
| g. | Bent Philipson | $5,801,354.83 |
| h. | Eric Kalt | $40,253.62 |
| i. | Israel Pollack | $20,126.81 |
| j. | Jacob Pollack | $40,253.62 |
| k. | Jeffrey Goldstein | $20,126.81 |
| l. | Jeffrey Vogel | $40,520.21 |
| m. | Joel Greeneberg | $85,902.84 |
| n. | Jordan Fensterman | $40,520.21 |
| o. | Judith Jones | $725,597.02 |
| p. | Katherine Muller | $25,028.54 |
| q. | Larry Klein | $414,852.41 |
| r. | Laurie Netzer | $138,284.14 |
| s. | Mayer Fischl | $1,548,472.87 |
| t. | Michael Prusansky | $20,126.81 |
| u. | Pinchus Hoffman | $1,169,257.04 |
| v. | Robert Kollman | $40,253.62 |
| w. | Ronald Stern | $201,268.09 |
| x. | Ruth Hirsch | $908,182.38 |

## Sixth: Cause of Action against Prohibited Transaction Defendants to Recover Plan Assets Diverted by Parties in Interest in Prohibited Transactions

285.     All the allegations previously stated are re-alleged and incorporated herein.

286.    Party[ies] in interest for purposes of this Amended Complaint is used to describe a person who receives monies, property or assets which is not at arms-length aiding in the scheme, wittingly or unwittingly, as their names may appear herein, along with other parties in interest not yet known, are identified herein as parties in interest on the diversion of funds intended for benefits for workers' compensation of employees of Employers.

287.    Plaintiff seeks monetary and equitable relief in connection with defendants' improper, fraudulent, and unlawful diversion, embezzlement and defalcation to an offshore fund which the parties to this Nassau County case are attempting to take beyond the reach of the Class in the following amounts:

Now known prohibited transactions under ERISA for the period June 11, 2010 through May 1, 2018, but not limited to, are as follows:

| | |
|---|---|
| Berkshire | $8,306,850 |
| Spencer Street Realty | $15,937,849 |
| Allstate ASO | $1,740,128 |
| Customer Withdrawals | $4,577,084 |
| Sam Schlesinger | $2,020,647 |
| Pitterman Family Trust | $1,891,037 |
| Wolf Eisenbach | $1,479,965 |
| National Financial Service | $1,415,972 |
| Dana K. Miklos | $1,153,532 |
| Israel Zeigelman | $619,612 |
| North American Mktg Spec Inc. | $589,218 |
| National Financial Service | $345,099 |
| B Kogan PLLC | $771,151.31 |
| Ira Lipsius and/or his firm of Lipsius-Benhaim Law, LLP | $797,329 |
| Whiteman Osterman  & Hanna, LLP and Cullen and Dykman, LLP | $1,101,395 |

**Seventh: Cause of Action against Employer Defendants for Illegal Employment Practices in Violation of 42 U.S.C. § 2000e-2**

288.    All the allegations previously stated are re-alleged and incorporated herein.

289.    The Percy Sub-Class is entitled to injunctive relief as demanded and actual damages for lost wages against the Employer Defendants, for lost opportunity and compensation as money damages for the families of the members of the Percy Sub-Class, their children growing up in poverty, significantly disadvantaged in education and skills, struggling to get a job, entitled to compensation as money damages to be determined at trial in this litigation.

290.    The members of the Percy Sub-Class have been and are ready, willing and able to work, persistently wanting to work, but have been constantly deprived and denied work, damaging the members of the Sub-Class, and damaging the families of the members of the Sub-Class, their children growing up in poverty, significantly disadvantaged in education and skills, struggling to get a job, in an amount to be determined at trial.

**Eighth: Cause of Action against Employer Defendants and Parties in Interest Prohibited Transaction Defendants for Conversion**

291.    All the allegations previously stated are re-alleged and incorporated herein.

292.    Employer Defendants, the Owner Operator Defendants and Parties-in Interest Prohibited Transaction Defendants, and other participants known and unknown, wrongfully converted to their own use funds stolen from trust through the fraudulent schemes herein set forth by wrongfully retaining that money and conspired to do so.

293.    The Plaintiff, the Class and the Trust have been damaged as a result of unjust enrichment in the damages set forth at the First, Second, Third, Fourth, Fifth, Sixth and Seventh Causes of Action herein.

**Ninth: Cause of Action against Employer Defendants and Parties in Interest Prohibited Transaction Defendants for Unjust Enrichment**

294.    All the allegations previously stated are re-alleged and incorporated herein.

295.    Employer Defendants, the Owner Operator Defendants and Parties in Interest Prohibited Transaction Defendants, and other participants known and unknown, have held and continue to hold funds stolen from trust from the Plaintiff without right thereto.

296.    The Plaintiff, the Class and the Trust have been damaged as a result of unjust enrichment in the damages set forth at the First, Second, Third, Fourth, Fifth, Sixth and Seventh Causes of Action herein.

## Tenth: Cause of Action against Employer Defendants. Owner Operator Defendants and Parties in Interest Prohibited Transaction Defendants for Breach of Fiduciary Duty

297.    All the allegations previously stated are re-alleged and incorporated herein.

298.    Employer Defendants, the Owner Operator Defendants and parties in interest Prohibited Transaction Defendants,  owe the employees  as the Class a fiduciary duty, a duty of loyalty and an obligation to administer diligently and carefully the affairs safeguard the property and assets in trust; to prevent trust assets from being wasted, stolen or squandered; and to keep honest, accurate and correct accounts of all affairs, business and transactions of trust monies; to make and publish true and accurate accounts and statements of the affairs of trust and to perform faithfully and diligently all the duties devolving upon Employer Defendants.

299.    As set forth herein, Employer Defendants, the Owner Operator Defendants and parties-in interest Prohibited Transaction Defendants,  have breached their fiduciary duties owed to the Class, and have failed to perform the fiduciary duties imposed upon them, and did not give proper care or oversight to the trusts funds in a skillful, careful, and diligent manner; but on the contrary, knowingly and fraudulently permitted opportunities, monies, property, and effects of those trust funds to be taken, wasted, and squandered, and transferred the opportunities, monies and other assets of those corporations for Employer Defendants' own personal accounts and for Employer Defendants' own personal use, and for the benefit of third parties, to the detriment of the

Class, accomplished the above by engaging in a deliberate course of conduct and scheme as set forth herein.

300.    The Plaintiff, the Class and the Trust have been damaged as a result of breach of fiduciary duties in the damages set forth at the First, Second, Third, Fourth, Fifth, Sixth and Seventh Causes of Action herein.

## Eleventh: Cause of Action against Employer Defendants, Owner Operator Defendants and Parties in Interest Prohibited Transaction Defendants for a Constructive Trust

301.    All the allegations previously stated are re-alleged and incorporated herein.

302.    Employer Defendants, the Owner Operator Defendants and Parties-in Interest Prohibited Transaction Defendants, with the assistance of the others known and unknown, knowingly received monies and assets either directly or indirectly from the Employer Defendants', under circumstances such that those Employer Defendants knew that the receipt of the moneys and assets was unlawful and improper.

303.    The exact amount of monies and assets received by the Employer Defendants and/or the Owner Operators and/or parties in interest is unknown.

304.    The conduct of the Employer Defendants, the Owner Operators and the parties in interest constituted intentional acts of wrongdoing undertaken by Employer Defendants with actual malice and in wanton and willful disregard of the rights of the employees of Employers, the Class Defendant.

305.    Employer Defendants and the Owner Operators are fiduciaries for the employee Employers and the 114 Trust for Plan assets received, directly or indirectly, and entitled to a return of those monies and assets to trust.

306.    Accordingly, a constructive trust must be imposed, and an accounting of the money ordered.

**Twelfth: Cause of Action against Employer Defendants, Owner Operator Defendants and Parties in Interest Prohibited Transaction Defendants for an Accounting**

307.    All the allegations previously stated are re-alleged and incorporated herein.

308.    Plaintiff is entitled to an accounting of all funds expended by Employer Defendants, the Owner Operator Defendants and parties in interest Prohibited Transaction Defendants, which belong to the Plaintiff and which have been misappropriated, diverted and stolen.

309.    Accordingly, an accounting of the money must be ordered.

**Thirteenth: Cause of Action under 42 U.S.C. §1983 against State Officers Enjoining Actions Conspiring to Deny the Class Equal Protection of Laws under Color of Law in Violation of the 14th Amendment to the US Constitution**

310.    All the allegations previously stated are re-alleged and incorporated herein.

311.    State Officers aided and abetted as part of the scheme, in a financial examination by the New York State Department of Financial Services, on licensing Standard and Preferred Insurance Company ("S & P") to become licensed as a New York domestic property and casualty insurance Company, which is evidenced by trace to the source of funding determinable by State Officers that the source was from the Employer Defendants from funds that should have been in trust, easily identified by the examining State Officers that failed, intentionally or otherwise, to identify with due diligence the capitalization of S & P, stopping at the escrow account provided by Calamari.

312.    In fact, the capitalization was from Plan assets funded by Prohibited Transactions by the Employer Defendants previously identified herein.

313.    It is prayed that the State Officers be enjoined under 42 U.S.C. §1983 from conspiring to deny the Class Equal Protection of Laws under Color of Law, in violation of the 14th Amendment to the US Constitution, and that the State Officers respond in monetary damages in an amount to be determined after trial.

**Fourteenth: Cause of Action under 42 U.S.C. 1985 against the Employer Defendants, Parties in Interest Prohibited Transaction Defendants, and Owner/Operator Defendants Conspiring to deprive the Class of Rights and Privileges Denying Equal Protection of the Laws under the 14th Amendment**

314.    All the allegations previously stated are re-alleged and incorporated herein.

315.    It was conspired as part of the scheme to defraud to cover the diversion of Plan assets that Employer Defendants electronically filed annual Cost Reports (Form RHCF-4) with the DOH for the years 2002 through 2017 as payments for benefits to the Class, when in fact, the funds were diverted to Prohibited Transactions Defendants. The Employer Defendants and parties in interest diverted funds received from Medicaid, private pay, Medicare and insurance, and converted to be unreachable by Class to reimburse claims paid on behalf of employees of the Employer Defendants.

316.    Employer Defendants made false statements in Cost Reports to the DOH regarding expenses for employee benefits which included statements that insurance coverage was being provided by party in interest Allstate as represented by its billing to the Employer Defendants' fraudulent scheme is premised on their unlawfully siphoning the Employer Defendants Medicaid, private pay, Medicare and insurance funds reported as intended for employee benefits. By virtue of the acts described here, the Employer Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay money to the State, and/or knowingly concealed or knowingly and improperly received funds which were not used for their intended and represented purpose.

317.    It was a part of the scheme that the reimbursements received by the Defendants were diverted from and not used to fund the 114 Trusts, the same funds identified as the Loss Retention Fund in the Lead Action.

318.    Philipson personally or through agents, made purchases of insurance coverages or made recommendations with respect thereto, facilitating the placement of health, workers'

compensation and disability coverage, while furthering the scheme using the opportunity and superior knowledge, access and experience of Philipson to accomplish the embezzlement.

319.    As a result of the relationship between Employer Defendants and Philipson, including, but not limited to, their role of control and superior knowledge and information regarding the occupational and non-occupational benefit plans for Employer Defendants' employees, along with ownership in the Employer Defendants in common with other Owner Operator Defendants, makes the Employer Defendants knowledgeable that the deceptive Cost Reports misrepresented to the DOH costs expensed and misrepresented as payment of employee benefits.

320.    Through the above-described conduct, Employer Defendants knowingly presented or caused to be presented false or fraudulent reports for payment or approval; and/or made, used, or caused to be made or used, a false record or statement to get false or fraudulent claims paid or approved; and/or made, used, or caused to be made or used, false records or statements to conceal that Employer Defendants were diverting funds. Specifically, Employer Defendants filed annual Cost Reports with the New York DOH, which among other things, falsely and impliedly certified that Employer Defendants were in compliance with all applicable laws and regulations.

321.    It was part of the scheme to provide false certification where the act of submitting false reports themselves imply compliance with governing rules that are a precondition to payment by the DOH.

322.    It was part of the scheme for Employer Defendants to submit claims falsely representing and certifying compliance with a statute, regulation, or contractual provision, compliance being a precondition to State DOH payment of the claim.

323.    It was part of the scheme for the Employer Defendants to fail to disclose noncompliance with material statutory, regulatory, or contractual requirements.

324.    Employer Defendants well knew that Plan services were not lawfully represented in the billing, yet the Employer Defendants engaged in a continuous and pervasive pattern of deceiving the DOH by Defendants' filing false Cost Reports when in fact the pattern and practice was to receive the monies and then divert the reimbursement for purposes other than as represented to the DOH.

325.    Employer Defendants owe the Class of Employees and the Rashbi Trust a common-law fiduciary duty to act in good faith.

326.    As a direct and proximate cause of Employer Defendants' breaches, Plaintiff and the Class have suffered damages including, but not limited to, additional and ongoing life of claim costs for medical treatment and reimbursement of lost wages of employees of Employers which are unable to be reimbursed out of trust funds because the trusts have not been funded.

327.    The Employer Defendants, Prohibited Transaction Defendants, Owner and Operator Defendants, conspired and acted under color of law to deny plaintiff equal protection of the laws under the 14th Amendment to the United States Constitution of individual and collective constitutional rights of the Class.

328.    The Employer Defendants, parties in interest Prohibited Transaction Defendants, and Owner/Operator Defendants conspired with State Officers to deprive the Class of rights and privileges to deny equal protection of the laws under the 14th Amendment and must respond in monetary damages in an amount set forth at the First, Second, Third, Fourth, Fifth, Sixth and Seventh Causes of Action herein to be determined after trial.

**Fifteenth: Cause of Action under 42 U.S.C. §1985 for Monetary Damages against State Officers Conspiring with the Employer Defendants, Parties-in-Interest Prohibited Transaction Defendants, and Owner/Operator Defendants to Violate 14th Amendment Equal Protection Constitutional Rights of the Class**

329.    All the allegations previously stated are re-alleged and incorporated herein.

330.    State Officers aided and abetted and allowed misapplication of the State Superintendents Order of February 1, 2013 prohibiting new policies under Insurance Law 1310, by means and methods including, but not limited to, State Officer Lees providing a letter of February 7, 2019 to Lipsius, Lipsius seeking to avoid Employer Defendants funding for benefits to the Class, Lees writing to Lipsius that the 1310 Order remained in effect, despite that Oriska Insurance addressed the impairment identified in the Superintendents Order, addressed on November 30, 2014, and so notified to State Officer Masterson on December 1, 2014.

331.    Michael Papa and the General Counsel for the Workers' Compensation Board ("WCB") requested of DFS General Counsel Martha Lees, word that the policies issued to the Employer Defendants were not in violation of law. Lees failed to and refused to issue the letter interpreting the Order of the Superintendent of February 1, 2013.

332.    The State DFS has refused to respond to WCB Officer Papa on the propriety of the Policies, forcing the issue of termination of the policies to hearing before the WCB, resulting in the decision by a WCB Judicial Officer.

333.    Oriska Insurance Company, then proceeded to hearing before the WCB, at which there was a ruling that the policies were fully enforceable. The WCB by Chief Appellant Judge of the WCB Madeline Pantzer by Order of October 2020, has determined that the Policies issued by Oriska Insurance to the Employer Defendants are fully proper, meeting all regulatory requirements of the WCL, an issue that the Councils Office of the DFS has deferred to the State Workers' Compensation Board.

334.    State Officers conspiring with the Employer Defendants, parties in interest Prohibited Transaction Defendants, and Owner/Operator Defendants, failed or neglected to enforce State Laws violating 14th Amendment Equal Protection Constitutional Rights, in violation of 42 U.S.C. §1985, as applied to the States under the United States Constitution for the individual and collective personal, malicious, and unlawful violations under color of state law.

335.    It is prayed that the State Officers be enjoined under 42 U.S.C. §1983 from conspiring to deny the Class Equal Protection of Laws under Color of Law, in Violation of the 14th Amendment to the US Constitution, and that the State Officers respond in monetary damages under 42 U.S.C. §1985, along with the Employer Defendants, Prohibited Transaction Defendants, and Owner/Operator Defendants conspired with State Officers to deprive the Class of rights and privileges to deny equal protection of the laws under the 14th Amendment, and must respond in monetary damages in an amount set forth at the First, Second, Third, Fourth, Fifth, Sixth and Seventh Causes of Action herein to be determined after trial.

## Sixteenth: Cause of Action 42 U.S.C. §1981 for Racial, or otherwise Class-based, Invidiously Discriminatory Animus Against the Employer Defendants, the Prohibited Transaction, and the Owner/Operator Defendants

336.    All the allegations previously stated are re-alleged and incorporated herein.

337.    This Complaint is also on behalf of a sub-class of the Class herein involving liability of the Employer Defendants for unlawful discriminatory employment practices.

338.    The Plaintiff on behalf of the sub-class of the Class states a claim of conspiracy pursuant to 42 U.S.C. § 1985(3), alleging that "racial, or otherwise class-based, invidiously discriminatory animus lay behind the defendants' actions, and has set forth facts from which a conspiratorial agreement between the defendants can be inferred."

339.    42 U.S.C. § 1985(3) creates a private right of action for recovery of damages "if two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons in the equal protection of the laws. . . ."

340.    It is prayed that the Employer Defendants, parties in interest Prohibited Transaction Defendants, and Owner/Operator Defendants conspiring to interfere with the Classes' property rights in skills and opportunities, rights and privileges in the Alternative Employment Practice, protected by laws under the 14th Amendment, respond in monetary damages under 42 U.S.C.

§1981, in an amount set forth at the First, Second, Third, Fourth, Fifth, Sixth and Seventh Causes of Action herein.

## Seventeenth: Cause of Action is brought under 42 U.S.C. §1983 to enjoin State Officers from Prohibiting Right to Assemble by the Class as Protected by the First Amendment to the United States Constitution

341.    All the allegations previously stated are re-alleged and incorporated herein.

342.    A seemingly separate scheme to deny constitutional rights to the sub-class of the Class occurred when the State Officers at SUNY Maritime College barred members of the Percy sub-Class from assembling at the premises despite the fact that proper permits and authorizations were in place and all permit fees were paid.

343.    This lawsuit seeks to enjoin the wrongful denial of assembly of the Percy sub-Class for apprentice training and continuing education at SUNY Maritime College, unnecessarily abrogating the apprentice training and continuing education provided by Plaintiff at the SUNY Maritime College in the Bronx.

## Eighteenth: Cause of Action against the Employer Defendants, Parties in Interest Prohibited Transaction Defendants, and Owner/Operator Defendants conspiring with State Officers for the Aiding and Abetting Breaches of Fiduciary Duties and Obligations enumerated herein

344.    All the allegations previously stated are re-alleged and incorporated herein.

345.    Employer Defendants, the Owner Operator Defendants and Parties-in Interest Prohibited Transaction Defendants,  knowingly induced and participated with the Employers in those breaches of fiduciary duties by providing substantial assistance to those Employer Defendants and had actual knowledge of the breaches of fiduciary duties by Employer Defendants.

346.    To the extent that certain of the Employer Defendants, the Owner Operator Defendants and parties in interest Prohibited Transaction Defendants, were not the primary violators with respect to particular acts and practices alleged as a basis for liability herein, they aided and abetted their co-Employer Defendants who were the primary violators.

347.    Each of the Employer Defendants, parties in interest Prohibited Transaction Defendants, and Owner/Operator Defendants, conspiring with State Officers Defendants, enabled and assisted in the accomplishment of one or more of the breaches of duty and wrongs committed by the primary violators constituting the actionable wrong in each Cause of Action herein, and thereby substantially assisted in the wrongs, crimes, torts, statutory violations and unfair practices alleged herein.

348.    Because of their aiding and abetting of each other's wrongs and illegal conduct, which contributed to the losses suffered by Class and to the injury of the employees, they are jointly and severally liable for all of the primary violations alleged herein that they knowingly and substantially assisted in accomplishing. By reason of the foregoing, the aiding and abetting of the breaches have proximately caused damages to the Class and Plaintiff and must respond in monetary damages in an amount set forth at the First, Second, Third, Fourth, Fifth, Sixth and Seventh Causes of Action herein.

## Nineteenth: Cause of Action under 42 U.S.C. § 1985 against the Employer Defendants, Parties in Interest Prohibited Transaction Defendants, and Owner/Operator Defendants conspiring with State Officers to Deprive the Class of Rights and Privileges Denying Equal Protection of the Laws under the 14th Amendment

349.    All the allegations previously stated are re-alleged and incorporated herein.

350.    In violation of ERISA's fiduciary duty and prohibited transaction provisions, Employer Defendants, the Owner Operator Defendants and parties in interest Prohibited Transaction Defendants, as part of the scheme, the Employer Defendants in the operation of their Plan diverted from their Plan funds identified for workers' compensation, health and disability benefits, diverting Plan assets needed to cover benefits in violation of their fiduciary duties to act solely in the interest of the Class as plan participant beneficiaries, Plan assets are for the exclusive

purpose of providing benefits to the Class along with specific identified expenses of their Plan. The Employer Defendants in control of their Plan, failed to carry out their duties.

351.    Under 29 U.S.C.S. §1003(b)(3), the Plan of the Employer Defendants was not maintained solely for the purpose of complying with workers' compensation laws, therefore their Plan is preempted by ERISA, 29 U.S.C.S. § 1001 et seq.

352.    Employer Defendants in a scheme to defraud their Plan as an employee welfare benefit plan as defined in 29 U.S.C. § 1002(1)(a) of ERISA, wrongfully exercised control and management over fund assets under 29 U.S.C. 186(c)(5) "employee benefit plans" within the meaning of 29 U.S.C. 1002(37), (1), (2) and (3), the Employer Defendants are fiduciaries under ERISA.

353.    Under ERISA, a fiduciary is required to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to [them]." 29 U.S.C. §1104(a)(1).

354.    Each Employer Defendants retained authority on their Plan Funds and payments from their Plan. As part of the scheme the Employer Defendants as fiduciaries used fund assets to satisfy other personal or business obligations or otherwise underfunded the obligations, breaching their fiduciary duty under ERISA. Under ERISA, any person who is a fiduciary with respect to the plan who breaches any one of the responsibilities, obligations, or duties imposed upon fiduciaries is personally liable "to make good to such plan any losses to the plan resulting from each such breach, and to restore the plan any profits of such fiduciary which have been made through the use of assets of the plan by the fiduciary..." 29 U.S.C. §1109(a).

355.    The Employer Defendants, parties in interest and State Officers have used the law to cover and hide their offenses, giving them the appearance of legality, all while the State Officers stood by and watched the misapplication of the law, not lifting one iota to straighten out the miscarriage, knowing intimately that the Employer Defendants were misusing the rulings of State

Officers to cover Prohibited Transactions of party in interest Defendants, knowing that the law and the rulings of State Officers were being misapplied and misinterpreted to cover and justify the looting by the Defendants, looting that must be disgorged and forfeited back to trust.

356.    The Employer Defendants' intent is to drive the Program and Trust into insolvency, liquidation making it extremely unlikely that the State Officers will pursue the Employer Defendants, Owner and Operator Defendants, Prohibited Transaction Defendants, or any other parties receiving booty from funds that should have been paid into trust, and the parties in interest knowing, relying and expecting the State Officers all the while knowing of the defalcation by the Employer Defendants, releasing the Employer Defendants from their obligations to the trust and to their Plan participant Class of employees.

357.    From at least about May 23, 2017, and long before dating back to May, 2002, and continuing to date, in or about the State of New York, and elsewhere, the Prohibited Transaction Defendant in the Program and Trust and the State Officers, together and with others known and unknown to the Plaintiff, to obtain money and property by false pretenses, representations, and promises, did knowingly communicate to effectuate the scheme by means of electronic communications, signs and signals or facsimile transmissions, and did willfully, knowingly combine and conspire and agree to deny equal protection of the laws as guaranteed by the 14th Amendment to the US Constitution, enforced by 42 U.S.C. 1983, by executing a scheme to divert, convert and secrete money and property by means of and for the purpose of executing the scheme, knowingly caused to be delivered by transmitting or cause to be transmitted by means of wire, radio, or television, communication, writings, signs, signals, pictures, or sounds all to cause and carry out the purpose of the conspiracy. It was part of the conspiracy for Lipsius to communicate with State Officer Lees in furtherance of the conspiracy, and to achieve the objects thereof, the Defendants as co-conspirators, each for their part in the scheme. Conspirators known and unknown to the Plaintiff, committed the overt acts set forth herein, and other overt acts in furtherance of the

conspiracy as a continuing conspiracy, even though participants in the conspiracy have changed over time, the preceding are only the most recent events. These recent events were preceded by acts beginning in May 2002, starting a pattern beginning on May 1, 2002, involving the same Employer Defendants with some attrition and new participants from time to time from then to the present, and involving State Officers who preceded the State Officers joined herein.

358.    Section 1983, 42 U.S.C. 1983, provides every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State subjects, or causes to be subjected, members of the Class or other person within the jurisdiction thereof to the deprivation of rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the Class in action at law, suit in equity, or other proper proceeding for redress.

359.    Under color of State law, State action occurred in the exercise of power possessed by virtue of state law, making possible the scheme because co-conspirators clothed with the authority of state law provided the means and methods for the Employer Defendants to be able to divert funds intended for benefits to the Class. The acts of State Officers caused harm and is a result of executed regulation or decision officially adopted and authorized by the State, the State created a danger by its enforcement policies affecting the Class, and there is a corresponding duty by the State Officers to protect the Class, giving rise to a 42 U.S.C. § 1985 Action to Vindicate Fourteenth Amendment rights of equal protection of the laws and due process of laws.

360.    It is prayed that the Employer Defendants, parties in interest Prohibited Transaction Defendants, and Owner/Operator Defendants conspiring with State Officers to deprive the Class of rights and privileges denying equal protection of the laws under the 14th Amendment, be enjoined under 42 U.S.C. §1983 from conspiring to deny the Class Equal Protection of Laws under Color of Law, in violation of the 14th Amendment to the US Constitution, and that they all respond jointly and severally in monetary damages under 42 U.S.C. §1985 in an amount to be determined after trial.

361.    The real parties in interest are the employees, the Class, and the Rashbi Trust, persons injured by the actions of the Employer Defendants, Prohibited Transaction Defendants, Owner/Operator Defendants, and State Officer Defendants, in conspiring to and diverting, converting and secreting Plan Funds and must respond in monetary damages in an amount set forth at the First, Second, Third, Fourth, Fifth, Sixth and Seventh Causes of Action herein.

## Twentieth: Cause of Action for Declaratory Judgment and Reimbursement

362.    Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

363.    This cause of action is for a declaration that the Employer-Defendant failed to secure the payment of compensation for its injured employees and their dependents and failed to satisfy the requirements of WCL §50, requiring reimbursement of all payments made by the Carrier-Defendant on behalf of the Employer-Defendant.

## Twenty-first: Cause of Action for Declaratory Judgment

364.    Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

365.    This cause of action results from the declaration that the Employer-Defendant Hamptons is uninsured as it relates to WCL §50, as of September 19, 2019, empowering the Class defendants with the option to elect commencement of plenary personal injury actions against Defendant-Employer Hamptons, or in the alternative to continue to accept workers' compensation benefits.

## Twenty-second: Cause of Action for Subrogation to the rights of Class defendants against Employer-Defendant

366.   Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

367.   Employer-Defendant Hamptons remains liable under Workers Compensation Law ("WCL") §10 as uninsured for Workers Compensation Insurance under WCL §50. The Employer-Defendant Hamptons disavowed and repudiated the Policy on September 19, 2019, leaving Employer-Defendant Hamptons uninsured as it relates to WCL §50, thus now empowering Class defendants with the option to elect commencement of plenary personal injury actions against Defendant-Employer, or in the alternative to continue to accept workers' compensation benefits.

368.   Having paid the claims of Class defendants, as a result of injuries incurred during their employment with the Employer-Defendant Hamptons, Carrier-Defendant is subrogated to the rights of the Class defendants against the Employer-Defendant Hamptons.

369.   This action is in subrogation to the rights and causes of action of the Class defendants herein against their uninsured Employer-Defendant Hamptons for negligence resulting in personal injury to injured Class defendants, applying all the presumptions afforded an injured worker under WCL §11, subrogated for any benefits paid for medical care, lost wages and expenses of Class defendants of Hamptons  paid by the Carrier-Defendant, a lien against any recovery of an Class defendant against Hamptons under Workers Compensation Law §29, and by subrogation as a direct action against the Employer Defendant if the Class defendant does not proceed against Hamptons within a time period set by the Court in this action.

370.   Plaintiff brings this derivative action on behalf of the Carrier-Defendant in subrogation to recover payments made to Class defendants by the Carrier-Defendant.

371.   This derivative action by the Plaintiff on behalf of the Carrier-Defendant is on grounds that Workers Compensation and Employer Liability insurance is admitted as not enforceable, disavowed by Employer-Defendants as illegal Workers' Compensation Insurance provided by the Carrier-Defendant, however the Carrier-Defendant has refused to undertake the

causes of action as set forth in this complaint as the causes of action here are in direct conflict with defenses raised in litigation between Carrier-Defendant and the Employer-Defendant.

372.    This action is against an admitted uninsured employer Hamptons and its Shareholder/Directors as the WCL §§26(a) and 52 equivalent of the president, secretary or treasurer of the Employer-Defendant and are jointly and severally liable with the Employer-Defendant for personal liability for the medical care, compensation payments, penalties and possible criminal prosecution pursuant to WCL §26, all of whom indeed benefited.

373.    Class defendants are liable in subrogation for payments made to Class defendants by the Carrier-Defendant.

## Twenty-third: Cause of Action for Subrogation to the rights of Carrier-Defendant Against Shareholder/Directors of Employer-Defendant

374.    Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

375.    Plaintiff is subrogated to the rights and causes of action as may arise out of the breach of lawful obligations and liability of the Shareholder/Directors of the Employer-Defendant under the WCL, vicariously, respondeat superior or otherwise in the premises and in particular the liability of Shareholder/Directors of Employer-Defendant corporations as set forth at WCL §25(a) and §52(c).

## RELIEF

WHEREFORE, Plaintiff seeks monetary and equitable relief in connection with the improper, fraudulent, and unlawful diversion, embezzlement and defalcation of millions of dollars which the Employer Defendant and its cohorts are attempting to take beyond the reach of the Class and Rashbi Trust:

1.    On the First Cause of Action a Judgment for the amounts set forth below to be paid into the 114 Trust against the Employer Defendant:

| Employer Defendant | Diverted Plan Assets |
|---|---|
| Hamptons | 4,694,262.29 |

2.      On the Second Cause of Action a Judgment in favor of the Plaintiff against the Employer Defendant for the amounts set forth below:

| Employer Defendant | Reimbursement Due |
|---|---|
| Hamptons | $511,032.24 |

3.      On the Third Cause of Action a Judgment in favor of the Plaintiff against the Employer Defendants listed below for the amounts set forth below to be paid into the 114 Trust as follows:

| Employer Defendant | Due to Trust |
|---|---|
| Hamptons | $2,277,826.27 |

4.      On the Fourth Cause of Action a Judgment in favor of the Plaintiff against the following Employer Defendants for the amounts set forth below to be paid into the 114 Trust:

| Employer Defendant | Diverted Plan Assets |
|---|---|
| Hamptons | $4,025,361.70 |

5.      On the Fifth Cause of Action Judgment in favor of the Plaintiff for the amounts set forth below to be paid into the 114 Trust against each of the Owner Operator Defendants as follows:

| | Owner Operators | Liability |
|---|---|---|
| a. | Aaron Becker | $161,263.03 |
| a. | Alan Chopp | $46,942.62 |
| b. | Benjamin Fishoff | $941,961.38 |
| c. | Benjamin Landa | $4,402,102.74 |
| d. | Bent Philipson | $4,926,558.02 |
| e. | Eric Kalt | $46,942.62 |
| f. | Israel Pollack | $23,471.31 |
| g. | Jacob Pollack | $46,942.62 |

| | | |
|---|---|---|
| h. | Jeffrey Goldstein | $23,471.31 |
| i. | Mayer Fischl | $1,682,553.97 |
| j. | Michael Prusansky | $23,471.31 |
| k. | Pinchus Hoffman | $1,363,554.29 |
| l. | Robert Kollman | $46,942.62 |
| m. | Ronald Stern | $234,713.11 |
| n. | Ruth Hirsch | $718,502.19 |

6.    On the Sixth Cause of Action Judgment in favor of the Plaintiff for the amounts set forth below to be paid into the 114 Trust against each of the Owner Operator Defendants as follows:

<u>Owner Operators</u>

| | | |
|---|---|---|
| a. | Aaron Becker | $138,284.14 |
| b. | Alan Chopp | $90,310.70 |
| c. | Ben Landa | $40,310.95 |
| d. | Ben Philipson | $2,700,138.01 |
| e. | Benjamin Fishoff | $807,738.26 |
| f. | Benjamin Landa | $6,631,760.62 |
| g. | Bent Philipson | $5,801,354.83 |
| h. | Eric Kalt | $40,253.62 |
| i. | Israel Pollack | $20,126.81 |
| j. | Jacob Pollack | $40,253.62 |
| k. | Jeffrey Goldstein | $20,126.81 |
| l. | Jeffrey Vogel | $40,520.21 |
| m. | Joel Greeneberg | $85,902.84 |
| n. | Mayer Fischl | $1,548,472.87 |
| o. | Michael Prusansky | $20,126.81 |
| p. | Pinchus Hoffman | $1,169,257.04 |
| q. | Robert Kollman | $40,253.62 |
| r. | Ronald Stern | $201,268.09 |
| s. | Ruth Hirsch | $908,182.38 |

7.    On the Seventh Cause of Action a Judgment in favor of the Plaintiff against each of the Prohibited Transaction Defendants as follows:

| Prohibited Transaction Defendants | Amount |
| --- | --- |
| Berkshire | $8,306,850 |
| Spencer Street Realty | $15,937,849 |
| Allstate ASO | $1,740,128 |
| Customer Withdrawals | $4,577,084 |
| Sam Schlesinger | $2,020,647 |
| Pitterman Family Trust | $1,891,037 |
| Wolf Eisenbach | $1,479,965 |
| National Financial Service | $1,415,972 |
| Dana K. Miklos | $1,153,532 |
| Israel Zeigelman | $619,612 |
| North American Mktg Spec Inc. | $589,218 |
| National Financial Service | $345,099 |
| B Kogan PLLC | $771,151.31 |
| Ira Lipsius and/or his firm of Lipsius-Benhaim Law, LLP | $797,329 |
| Whiteman Osterman  & Hanna, LLP and Cullen and Dykman, LLP | $1,101,395 |

8.      On the Eighth Cause of Action a Declaratory Judgment declaring that the acts of the Employer Defendants are illegal employment practices in violation of 42 U.S.C. § 2000e-2, and award to the Plaintiff on behalf of the Class, actual damages for lost wages, for lost opportunity and compensation as money damages to be determined at trial in this litigation.

9.      On the Ninth Cause of Action a Judgment in favor of the Plaintiff against each of the named Employer Defendants as set forth in the Second, Third, Fourth, Fifth, and Sixth Causes of Action.

10.     On the Tenth Cause of Action a Judgment in favor of the Plaintiff against each of the named Employer Defendants as set forth in the Second, Third, Fourth, Fifth, and Sixth Causes of Action.

11.     On the Eleventh Cause of Action a Judgment in favor of the Plaintiff against each of the named Employer Defendants as set forth in the Second, Third, Fourth, Fifth, and Sixth Causes of Action.

12.     On the Twelfth Cause of Action a Judgment in favor of the Plaintiff against each of the named Employer Defendants as set forth in the Second, Third, Fourth, Fifth, and Sixth Causes of Action.

13.     On the Thirteenth Cause of Action a Declaratory Judgment calling for an accounting.

14.     On the Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth and Twentieth Causes of Action against State Officers Conspiring with the Employer Defendants, Parties-in Interest Prohibited Transaction Defendants, and Owner/Operator Defendants:

DECLARING that the actions complained of herein by such Defendants individually and collectively, alone and in concert with present and former associates and other still unidentified parties, cloaking themselves with the color of law and utilizing all the power of the State in a malevolent effort to the Plaintiff Class an opportunity to compete effectively to obtain the benefits of economic opportunities for which they would otherwise qualify but for the lack of access to the Program that was adopted as their Plan, represented an abuse of the powers of such individual named Defendants as employees and agents of the State of New York and as such were ultra vires actions, caused serious, permanent and irreparable economic and social injury and damage to the Plaintiffs and to the Class deliberately impeded efforts to utilize the Program to foster creation of jobs providing reliable and steady income and benefits for the Plaintiff Class and their families and

RESTRAINING and prohibiting the State Officers from the acts as pled herein,

and

DECLARING the actions of the individual Defendants in conspiracy represent an abuse of the powers of such individual State Officer Defendants as employees and agents of the State of New York, and as such were ultra vires actions, were taken with the purpose of impairing the Class to enter the workforce at a level of skill and training which will permit them to be safe and rapidly advance in careers; and

AWARDING Plaintiff by subrogation actual damages for lost wages and benefits and lost opportunity damages to the Class and damaging the families of the members of the Class, their children growing up in poverty, significantly disadvantaged in education and skills, struggling to get a job, in an amount to be determined at trial, and

AWARDING damages in an amount set forth at the First, Second, Third, Fourth, Fifth, Sixth and Seventh Causes of Action herein.

15.    On the Twenty first Cause of Action:

| Employer Defendant | Net Amount Due |
|---|---|
| Hamptons | 1,126,223.64 |

16.    ALL together with interest, costs, disbursements and such other and further relief as shall seem just and proper under the circumstances.

17.    For a Declaratory Judgment that the Employer-Defendant North Sea Associates, LLC, - The Hamptons Center is uninsured as it relates to WCL §50.

18.    For a Declaratory Judgment on the Second Cause of Action that as of September 19, 2019, empowering Class defendants with the option to elect commencement of plenary personal injury actions against Defendant-Employer North Sea Associates, LLC, - The Hamptons Center, or in the alternative to continue to accept workers' compensation benefits.

For a Declaratory Judgment on the Third Cause of Action permitting the Plaintiff to proceed with this derivative action after the time by which the Class defendants have to elect as declared in the Second Cause of Action, after which the Carrier-Defendant shall be subrogated to the rights and opportunities of each Class defendant, and in turn such rights and opportunities shall be available to Plaintiff by derivative action.

Together with interest and the costs and disbursements of this action.

Demand is made for trial by jury on all the issues so triable.

Dated: Utica, NY
        January 25, 2021

s/ *Frank Policelli*

_____
Frank Policelli, Esq.
Attorney for Plaintiff
Oriska Corporation
10 Steuben Park,
Utica, NY 13501
phone: (315) 235-1735
email: frankpolicelli@centralny.twcbc.com
fax: (315) 793-8743